288

F. E. WATKINS MOTOR COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 62322. Filed October 31, 1958.

*W. Gibson Harris, Esq.*, and *Lewis B. Greenbaum, Esq.*, for the petitioner.

*Frank W. Hardy, Esq.*, for the respondent.

ARUNDELL, *Judge:* Respondent determined deficiencies in income tax for the calendar years 1951 and 1952 in the amounts of $17,568.54 and $15,131.24, respectively.

The only issue remaining is whether the respondent erred in determining that petitioner was subject to the surtax imposed by section 102 of the Internal Revenue Code of 1939, as amended, for each of the above-mentioned years. Another issue was raised by the pleadings but was abandoned at the hearing.

### FINDINGS OF FACT.

Some of the facts were orally stipulated and are so found.

Petitioner is a Virginia corporation with its principal office in South Hill, Virginia. It duly filed its Federal income tax returns for the calendar years 1951 and 1952 with the proper officer in the Richmond district, Richmond, Virginia.

Petitioner was organized in April 1946. At all material times, petitioner has had issued and outstanding 250 shares of $100-par-value common stock. Of this stock, Fred E. Watkins (hereafter called Watkins) owned 125 shares; his wife, Ava W. Watkins (hereafter called Watkins' wife), owned 124 shares; and Ruby Millirons owned 1 share.

At all material times, petitioner's officers consisted of Watkins as president, Watkins' wife as vice president and treasurer, and Millirons as secretary, and these three officers constituted the board of directors. Since its organization Watkins has been the operating head of petitioner and has controlled its policies.

Petitioner kept its books and filed its returns on an accrual method of accounting.

On January 16, 1956, respondent mailed to petitioner a registered letter notifying petitioner, pursuant to section 534 of the Internal Revenue Code of 1954, as amended by sections 4 and 5 of Public Law 367,[1] 84th Cong., ch. 805, 1st Sess., of a proposed issuance of a notice of deficiency for the years 1951 and 1952, setting forth the amount

[1] Published in 1955–2 C. B. 768.

of tax claimed by respondent to be due pursuant to section 102 of the Internal Revenue Code of 1939, as amended.

Pursuant to section 534 (c) of the Internal Revenue Code of 1954, petitioner, on February 15, 1956, mailed to respondent by registered mail a reply to respondent's notification of January 16, 1956. This reply or statement consisted, among other things, of 21 numbered paragraphs and 5 exhibits, setting forth the grounds and facts on which petitioner relied to establish that its earnings and profits for the taxable years in question had not been permitted to accumulate beyond the reasonable needs of the business.

On February 16, 1956, respondent mailed to petitioner by registered mail the notice of deficiency from which this petition has been filed. In this notice the respondent determined that petitioner's "undistributed section 102 net income" under section 102 (d) (2) of the Internal Revenue Code of 1939 was $63,885.59 for the taxable year 1951 and $55,022.70 for the taxable year 1952, on which he determined a surtax equal to 27½ per centum, constituting the deficiencies here in controversy.

Had petitioner distributed to its stockholders the above-mentioned "undistributed section 102 net income," Watkins and his wife would have been required to pay additional personal income taxes for the years 1951 and 1952 of approximately $45,400 and $33,800, respectively.

Petitioner is the corporate successor to an automobile dealership which was started by Watkins in 1927. In December 1926 Watkins obtained the Chevrolet agency which he operated in South Hill, Virginia, commencing in January 1927, first as a sole proprietorship and then, following his marriage, as a partnership. Since 1946 petitioner has sold at retail Chevrolet cars and trucks, and Oldsmobile cars, under a franchise from General Motors for part of Mecklenburg County and, in the case of the Oldsmobile franchise, all of Lunenburg County.

The territory covered by petitioner's franchise is a farming community producing cotton, tobacco, and peanuts. There are no large towns in this area. South Hill, with a population which has ranged from 1,000 in 1927 to about 2,000 at the present time, has no substantial industry. Business throughout this community, including petitioner's, depends on sales to farmers. Such sales have made up about 75 per cent of petitioner's business. In years when crops were poor, it was necessary either to repossess substantial numbers of the vehicles which farmers had bought on credit or to renew their indebtedness for another year.

Conditions in the automobile business were abnormal from the time petitioner was organized through 1952. It was a period of high profits and rapid expansion. Throughout this period there was a ready market for all new cars produced. Until 1949 petitioner was able to sell most new cars for cash as it received them, pay for the cars by the due date of the invoice, and take its full profit immediately. Where petitioner did receive trade-ins of old cars, it made money re-selling them. After 1949, sales involving trade-ins and financing through General Motors Acceptance Corporation (G. M. A. C.) increased, and petitioner's inventories rose. By the end of 1950 petitioner's cash sales had declined to 48 per cent of total sales and in 1951 and 1952 declined to 40 per cent of total sales.

The following schedule shows petitioner's total sales, net profits after taxes, year-end inventories, customers' notes and accounts receivable, and year-end balances of contingent liabilities representing notes receivable discounted with G. M. A. C. for the years 1946 through 1952:

| Year | Total sales | Net profit after taxes | Inventories | Customers' notes and accounts receivable | G. M. A. C. balance |
|------|------------|------------------------|-------------|------------------------------------------|---------------------|
| 1946 | $375,352 | $37,295 | $51,396 | $27,546 | $14,794 |
| 1947 | 664,316 | 62,704 | 80,089 | 25,951 | 25,100 |
| 1948 | 765,680 | 62,730 | 108,747 | 40,669 | 54,416 |
| 1949 | 1,138,896 | 67,642 | 54,219 | 84,554 | 206,000 |
| 1950 | 1,423,058 | 84,030 | 110,661 | 166,528 | 192,046 |
| 1951 | 1,204,163 | 63,888 | 115,205 | 154,427 | 240,000 |
| 1952 | 1,109,311 | 48,563 | 93,554 | 124,209 | 252,576 |

At all times petitioner was in the business of selling new cars and trucks and was in the used-car business only to the extent of selling trade-ins.

Petitioner financed most of its purchases of new cars from General Motors by floor planning them with G. M. A. C. Under this arrangement G. M. A. C. took petitioner's note for the wholesale price of each new car shipped to petitioner, secured by the car, and petitioner was required to pay off this note within 5 days after petitioner sold the car. Petitioner also had to pay interest on the note, curtail the principal on cars not sold within 6 months, and pay the balance if the car was not sold at the end of 12 months or when new models came out. In the case of cars used as demonstrators (which petitioner called "company cars"), G. M. A. C. also required petitioner to make monthly payments to curtail principal.

At all material times petitioner as a matter of business policy did not borrow against used cars. Consequently, when petitioner sold a new car and accepted a used car in part payment, and the trade-in allowance exceeded petitioner's gross profit, petitioner had to pay such

excess to G. M. A. C., thereby reducing petitioner's cash. This happened more often in 1951 and 1952 than previously since by that time petitioner was receiving late model used cars on which larger allowances had to be made. A dealer without sufficient resources to make such trades is referred to in the automobile business as "frozen."

At all times material petitioner self-financed its sales on credit of parts, accessories and services, and a small part of its car sales. However, most of petitioner's car sales on credit were conditional sales with petitioner assigning the contract to G. M. A. C. for the difference between the purchase price and the trade-in allowance or downpayment. Under the arrangement, petitioner was obligated to repurchase all cars repossessed by G. M. A. C. by paying the entire balance due on the contract. This is known as "recourse" financing.

At all material times, about 75 per cent of petitioner's business came from farmers and a large percentage of petitioner's sales were financed on the "farmer plan." Farmer plan financing is a plan whereby farmers whose income is dependent on the sale of crops and who have no regular weekly or monthly income are not required to make monthly payments, and the balance owed on a vehicle does not become due until the farmer sells his crops. At times, as much as two-thirds of petitioner's sales were on the farmer plan. Petitioner's farmer plan sales amounted in the aggregate to as much as those of all the rest of the Chevrolet dealers in Virginia.

Because there was no monthly curtailment and because when crops were bad petitioner would frequently renew the farmers' notes, the risk of loss on sales financed on the farmer plan was greater than the risk of loss on sales financed on a monthly payment basis. This required petitioner to have substantial financial resources available to repurchase the farmer plan notes it had assigned to G. M. A. C. In 1953 and 1954 following successive crop failures petitioner was compelled to repurchase from G. M. A. C. a total of 205 cars and trucks at an average of about $800 per car, or a total of about $160,000.

Truck sales formed a large percentage of petitioner's total sales. In June 1952 petitioner's volume of truck sales was third out of 171 dealers in the Baltimore zone which included such large cities as Washington, Baltimore, Norfolk, and Richmond. Truck sales on any plan of financing are more risky than car sales because trucks depreciate more rapidly and the resale market is poorer.

In accordance with the custom in the automobile industry and the uniform accounting system prescribed by General Motors, petitioner did not at any time set up a reserve on its books against its contingent liability on the notes it had assigned to G. M. A. C. and merely noted the existence of this contingent liability on its balance sheet. However, at all times petitioner estimated that its losses on this contingent

liability would amount to 10 per cent of the face amount of the outstanding balance on the notes and, for practical purposes, it considered this 10 per cent a current liability.

In 1951 and 1952 petitioner still occupied the same rented building that the business had occupied since 1936. The only addition was the used-car lot across the street from petitioner's place of business which it acquired in 1952 but did not complete until 1953.

The building petitioner occupied from 1946 through 1952 contained about 18,000 square feet. According to the Chevrolet Division's Space Requirement Guide, petitioner's business as of November 1951 through April 1952 required 36,950 square feet. This Space Requirement Guide represents the space Chevrolet has found the average dealer requires in accordance with his "planning potential." "Planning potential" means the volume of sales the Chevrolet Division finds on the basis of a survey of car sales in a dealer's territory that a dealer should make. Petitioner's planning potential as of November 1951 through April 1952 was 303 new cars and 300 used cars. Petitioner actually sold 310 or more new cars in every year from 1947 through 1952, and 325 and 349 used cars in 1950 and 1953, respectively. Used-car sales were slightly below the planning potential in 1951 and 1952 when they totaled 274 and 290, respectively.

The building which petitioner occupied in 1951 and 1952 and petitioner's facilities were inadequate and had been inadequate for some time. The premises were congested. Parts were stored in the window intended to display the new cars. It was necessary to spend about the first half hour of each business day driving new and used automobiles and trucks out of the building petitioner occupied and parking them in the adjacent street and alley and the last half hour bringing them back in. At times the crowding was such that cars were left overnight in the street. The South Hill town authorities complained of the congestion in the alley and street and demanded that petitioner obtain further space.

In the summer of 1951 the Chevrolet Division of General Motors insisted that petitioner obtain additional space and expand its facilities. The Chevrolet Division had a contractual right to insist upon this under the terms of its franchise agreement with petitioner which provided that "Dealer will maintain a place of business including salesroom, service station, parts and accessories facilities, and used car facilities satisfactory to Seller."

Since prior to 1950 and in 1951 and 1952 petitioner planned to acquire from Export Leaf Tobacco Company the 210' x 120' lot across the alley in the rear of the building occupied by petitioner and erect a single building covering the entire area which would contain a storage area, a paint and body shop, and repair and servicing

facilities. This lot had on it an old tobacco warehouse that was used by Export in its tobacco business. This was the only property available adjacent to petitioner's place of business. The Export Leaf property was appraised in 1950 and again in 1951 at $10,000. Plans for a frame straightener and pit were prepared in November 1952 although there was no place to put it in petitioner's then-existing facilities.

Petitioner estimated that the cost of erecting and equipping the building which it planned to erect on the Export Leaf land would be $150,000.

Since 1949 petitioner had planned to acquire a used-car lot. Petitioner bought flood lights and signs for this purpose in 1949 and had the electrical system planned in November 1951. In 1951 and 1952 petitioner also planned to acquire a large tract to store those used cars which, while not good enough to repair, could be used as a source of usable parts.

In 1952, petitioner, expecting that it would acquire the Export Leaf property and open the display lot for used cars, planned to put tires and accessories in the 20' x 40' area where its parts bins had been and to put larger parts bins in the 45' x 100' area where it was then showing its used cars. The estimated cost of the bins was $18,053.12.

In 1952, petitioner again attempted to acquire the property of Export Leaf Tobacco Company in the rear of petitioner's place of business. In April 1953 petitioner and Export Leaf agreed that Export Leaf would exchange this property for a new warehouse to be built by petitioner to Export Leaf's specifications. Watkins estimated that the cost of erecting the building for Export Leaf would be between $30,000 and $38,000. Construction began in July 1953 and was completed by the middle of September 1953 although a controversy over easements delayed actual passage of title until March 1954. Petitioner's actual cost of acquiring the property from Export Leaf after deducting sums paid petitioner by Export Leaf was $25,858.48.

Petitioner began to carry out its plan to build on the Export Leaf property after title was transferred formally in 1954. Petitioner took advantage of an opportunity to acquire steel at a savings of about $10,000 from an Atlantic & Danville Railroad roundhouse which was being demolished and built a 70' x 210' building (identified as Building #2) to match this steel, instead of erecting a single building to cover the entire lot. This building was substantially completed in 1955 and actually completed in 1956 at a cost of $42,477.08. Approximately $20,000 more will be required to complete petitioner's plan for installing heat and paint-baking ovens. Peti-

tioner was able to save about $10,000 in estimated construction costs by using culled brick.

Petitioner has continued to carry out its plan to build over the entire Export Leaf property. In 1956 it tore down the old Export Leaf warehouse and work on the second building (Building #3) began in 1957. Watkins estimated that the total cost of erecting and equipping Building #3 would be about $40,000. Of this amount, $13,669.20 was actually spent during the year 1957.

Petitioner carried out its plan to acquire and equip a lot to display used cars for sale. Petitioner acquired the lot across the street from its place of business in 1952 and commenced work that year, completing it in 1953 at a total cost of $8,374.08. Plans for further facilities for used cars are still being worked on.

In March 1953 petitioner substantially carried out its plan to install additional bins. By leaving out trimming, petitioner cut the cost to $11,200.01. During the years 1951 to 1957, inclusive, petitioner also spent $22,514.18 for machinery, equipment, furniture, fixtures, and parts.

In 1951 and 1952 petitioner recognized that its need for working capital, additional space, and facilities would increase. Petitioner recognized that its business was becoming and would continue to become increasingly competitive; that to survive it would have to maintain sales volume and could do so only by cutting prices in the face of increasing costs; that cash sales, which were declining from 1950 to 1952, would continue to decline and customers' notes and accounts receivable would increase and would remain outstanding longer; that the outstanding balance on accounts financed with G. M. A. C. would substantially increase; and that it would need considerably more capital to finance the increase of its inventories of parts, accessories, and used cars.

Petitioner's total sales, net profits (or losses) after taxes, year-end inventories, customers' notes and accounts receivable, and year-end balances of contingent liabilities representing notes receivable discounted with G. M. A. C. for the years 1953 through 1957 were as follows:

| Year | Total sales | Net profit after taxes (or net loss) | Inventories | Customers' notes and accounts receivable | G. M. A. C. balance |
|---|---|---|---|---|---|
| 1953 | $1,263,422 | $21,491 | $182,916 | $142,977 | $393,465 |
| 1954 | 1,501,317 | 28,285 | 135,554 | 148,204 | 591,938 |
| 1955 | 1,433,822 | (6.772) | 185,875 | 247,074 | 726,969 |
| 1956 | 1,224,168 | (2,887) | 222,594 | 258,722 | 608,893 |
| 1957 | 1,166,387 | (10,536) | 188,785 | 276,583 | 583,069 |

Petitioner's year-end balance sheets for 1950, 1951, 1952, and 1953 as shown by petitioner's books and records were as follows:

|  | 1950 | 1951 | 1952 | 1953 |
|---|---|---|---|---|
| *Assets* | | | | |
| Cash | $34,865 | $39,232 | $39,283 | $26,644 |
| Total notes and accounts receivable | 158,056 | 147,745 | 122,447 | 156,930 |
| Inventories | 110,661 | 115,205 | 93,554 | 182,916 |
| Other | 6,319 | 7,489 | 20,580 | 25,144 |
| Total current assets | 309,902 | 309,673 | 275,868 | 391,637 |
| Stocks and bonds | 55,600 | 56,235 | 57,535 | 57,535 |
| Dawson note, etc | 17,000 | 18,000 | 145 | |
| G. M. A. C. repossession reserves | 9,096 | 13,251 | 11,936 | 19,539 |
| Due from officers | 141,233 | 194,308 | 247,600 | 183,953 |
| Fixed assets (cost less depreciation) | 11,500 | 14,094 | 19,584 | 45,026 |
| Total | 544,333 | 605,563 | 612,669 | 697,692 |
| *Liabilities and capital* | | | | |
| Current liabilities | 199,673 | 198,368 | 154,476 | 218,007 |
| Long-term debts | 5,500 | 4,125 | | |
| Total liabilities | 205,173 | 202,493 | 154,476 | 218,007 |
| Capital stock | 25,000 | 25,000 | 25,000 | 25,000 |
| Surplus | 314,159 | 378,070 | 433,192 | 454,684 |
| Total net worth | 339,159 | 403,070 | 458,192 | 479,684 |
| Total | 544,333 | 605,563 | 612,669 | 697,692 |

Substantially all of petitioner's investments in stocks and bonds were acquired in 1948 when petitioner accepted Curles Neck Dairy stock with the par value of $50,000 in payment of the latter's debt to petitioner and petitioner invested $5,500 in the bonds of Cavalier Resort Corporation. Watkins owned only a minority interest in both corporations and other stockholders of Cavalier, owning as much stock as Watkins, are also in the automobile business. Both Cavalier, which operates a hotel and golf course at Virginia Beach, and Curles Neck Dairy, and the latter's parent corporation, Curles Neck Farm, are customers of petitioner. The farm and dairy buy all of their vehicles, automobiles, tractors, refrigerator trailers, milk bodies, and accessories from petitioner, and Cavalier buys most of its vehicles from petitioner. Since petitioner acquired these securities, Curles Neck Dairy and Curles Neck Farm have made purchases from petitioner totaling about $175,000, and Cavalier has made purchases from petitioner totaling between $10,000 and $20,000.

Sums shown on the balance sheet as "Due from Officers" were the combined bona fide loans which petitioner had made from time to time to Watkins and his wife and were regarded by petitioner's management as the equivalent of cash and as a current asset. When petitioner made these loans, all parties intended that they were to be repaid and all parties recognized that the needs of the business would require that they be repaid. In 1953 and 1954 petitioner was repaid most of the

sums borrowed and by the end of 1955 the outstanding combined net balance had been reduced to $2,601.60. In 1956 and 1957 Watkins lent petitioner a total of $118,946.47, and petitioner lent Watkins' wife $4,873.77, after which the combined net balance owing by petitioner to the Watkinses amounted to $111,471.10, which latter amount was carried on petitioner's balance sheet as of December 31, 1957, as an account payable. During all of the years relevant to this proceeding, no interest was paid by or to officers on advances and notes to and from petitioner.

Petitioner's current assets, current liabilities, working capital, and ratio of current assets to current liabilities for the years 1951 and 1952, are as follows:

|  | 1951 | 1952 |
|---|---|---|
| (1) Current assets per balance sheets | $309, 673 | $275, 868 |
| (2) Amounts due from officers | $194, 308 | $247, 600 |
| (3) Total current assets (actual) | $503, 981 | $523, 468 |
| (4) Current liabilities per balance sheets | $198, 368 | $154, 476 |
| (5) Plus 10 per cent of G. M. A. C. balance | $24, 000 | $25, 285 |
| (6) Total current liabilities (actual) | $222, 368 | $179, 734 |
| (7) Working capital (3) minus (6) | $281, 613 | $343, 734 |
| (8) Ratio of (3) to (6) | 2.26 to 1 | 2.91 to 1 |

Petitioner's fixed assets as of December 31 for the years 1950 to 1957, inclusive, together with the reserve for depreciation thereon, and the net amount after deducting depreciation, were as follows:

| Year | Cost | Depreciation | Net | Year | Cost | Depreciation | Net |
|---|---|---|---|---|---|---|---|
| 1950 | $26, 306 | $14, 806 | $11, 500 | 1954 | $120, 800 | $26, 869 | $93, 930 |
| 1951 | 27, 730 | 13, 635 | 14, 094 | 1955 | 160, 945 | 37, 533 | 123, 413 |
| 1952 | 35, 901 | 16, 317 | 19, 584 | 1956 | 176, 047 | 50, 575 | 125, 471 |
| 1953 | 64, 265 | 19, 239 | 45, 026 | 1957 | 187, 891 | 61, 937 | 125, 955 |

Based on conditions existing in petitioner's business between November 1951 and April 1952, petitioner and the Chevrolet Motor Division of General Motors Corporation entered into a "Minimum Capital Standard Agreement" in which it was agreed that "The minimum amounts of Owned Net Working Capital and Total Owned Capital required for the proper operation of the subject dealership are $226,754 and $417,705, respectively, and that * * * The subject Dealer warrants that the Total Owned Net Working Capital is $238,317 and the Total Owned Capital (Net Worth) is $429,268, as of April 30, 1952."

Exclusive of petitioner's contingent liability on paper assigned to G. M. A. C. and exclusive of the funds needed for physical expansion, petitioner's reasonable working capital requirements for 1 year's operation in each of the years 1951 and 1952 was approximately $240,000.

Petitioner paid no dividends in 1951 or 1952 but did pay a dividend of $5,000 in each of the years 1954, 1955, and 1956.

Petitioner did not permit its earnings or profits in 1951 and 1952 to accumulate beyond the reasonable needs of the business.

Petitioner was not formed, nor was it availed of during 1951 or 1952, for the purpose of preventing surtax on its principal stockholders, the Watkinses, by permitting earnings or profits to accumulate beyond the reasonable needs of the business.

### OPINION.

The material provisions of section 102 of the Internal Revenue Code of 1939, as amended, are in the margin.[2]  The parties agree that petitioner's "undistributed section 102 net income" as defined in section 102 (d) is the amount of $63,885.59 for the year 1951 and the amount of $55,022.70 for the year 1952.  The question to be decided is whether petitioner was "availed of for the purpose" of preventing the imposition of the surtax upon its shareholders "through the medium of permitting earnings or profits to accumulate instead of being divided or distributed."  This is a question of ultimate fact.  *Helvering* v. *National Grocery Co.*, 304 U. S. 282; *Helvering* v. *Chicago Stock Yards Co.*, 318 U. S. 693.  Obviously, petitioner was not "formed" for that purpose.

This proceeding was tried on the merits after the date of the enactment of Public Law 367.[3]  Sections 4 and 5 of this enactment amended section 534 of the Internal Revenue Code of 1954 relating to the burden of proof.  Regardless of which party had the burden,[4] we are convinced and have so found as ultimate facts that petitioner did not permit its earnings or profits to accumulate beyond the reasonable needs of the business and that it was not availed of for the purpose of preventing the imposition of the surtax upon its shareholders.

---

[2] SEC. 102.   SURTAX ON CORPORATIONS IMPROPERLY ACCUMULATING SURPLUS.

(a) IMPOSITION OF TAX.—There shall be levied, collected, and paid for each taxable year (in addition to other taxes imposed by this chapter) upon the net income of every corporation * * * if such corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders * * * through the medium of permitting earnings or profits to accumulate instead of being divided or distributed, a surtax equal to the sum of the following :

27½ per centum of the amount of the undistributed section 102 net income not in excess of $100,000, plus

\*　　\*　　\*　　\*　　\*　　\*　　\*

(c) EVIDENCE DETERMINATIVE OF PURPOSE.—The fact that the earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary.

(d) DEFINITIONS.—As used in this chapter—

\*　　\*　　\*　　\*　　\*　　\*　　\*

(2) UNDISTRIBUTED SECTION 102 NET INCOME.—The term "undistributed section 102 net income" means * * *

[3] See footnote 1 in our findings.

[4] Cf. *Pelton Steel Casting Co.*, 28 T. C. 153, affd. (C. A. 7) 251 F. 2d 287, certiorari denied 356 U. S. 958.

Petitioner established beyond question its need in 1951 and 1952 for additional physical facilities. It was cramped for space and unquestionably had to expand or run the risk of losing its franchise with General Motors who had insisted in 1951 that petitioner acquire more space. At that time, petitioner occupied the same premises with which it commenced business in 1946 without any substantial increase in facilities although its sales had increased from $375,000 in 1946 to over $1,423,-000 in 1950. The evidence shows that petitioner needed more than twice the 18,000 square feet of floor space upon which it was operating. During the years here in question, petitioner had plans to acquire from Export Leaf Tobacco Company the 210-foot by 120-foot lot across the alley in the rear of its building and erect a building and other facilities thereon which petitioner estimated would cost, together with the cost of the lot, approximately $178,000.[5] In April 1953 Export finally agreed that it would exchange this lot on which stood an old tobacco warehouse for a new warehouse in another location to be built to Export's specifications. The construction of the new warehouse was completed by the middle of September 1953 and petitioner acquired title to the lot and old warehouse across the alley in March 1954. It then proceeded with its plans of physical expansion, the details of which are set out in our findings and the cost thereof summarized in the footnote below.[6] When consideration is given to the fact that petitioner was able to take advantage of considerable savings in cost and that at the close of 1957 it still needed about $46,300 to install the ovens and complete Building #3, it is at once apparent that its estimated cost of approximately $178,000 made in 1951 and 1952 of plans for additional physical facilities then needed in its business was not unreasonable. We think the accumulation of earnings or profits during the taxable years 1951 and 1952 to meet these plans of physical expansion was within the reasonable needs of petitioner's business. See *Dill Manufacturing Co.*, 39 B. T. A. 1023, 1031.

In the instant case petitioner had specific and definite plans for acquisition of the then needed buildings and equipment for use in its busi-

---

[5] Our findings show this estimate to be made up of the appraised value of the Export property $10,000; the estimated cost of the building to be erected $150,000; and the estimated cost of bins $18,053.12.

[6] Summary of cost follows:

| | |
|---|---:|
| Acquisition of Export property (1953) | $25, 858. 48 |
| Building #2 (1954–1956) | 42, 477. 08 |
| Building #3 (1957) | 13, 669. 20 |
| Lot for used cars (1952–1953) | 8, 374. 08 |
| Bins (1953) | 11, 200. 01 |
| Machinery, equipment, etc. (1951–1957) | 22, 514. 18 |
| Total | 124, 093. 03 |

Petitioner was able to save about $20,000 on Building #2 and by leaving out trimming it saved about $6,800 on the bins. Approximately $20,000 more will be required for installing heat and paint-baking ovens and about $26,300 to complete Building #3.

ness. The real question is whether a greater surplus has been accumulated than was necessary for the reasonable needs of the business. In resolving this question, we think the actual current needs of the business are to be considered and also the necessity for presently accumulating a surplus to meet foreseeable future needs. *Lion Clothing Co.*, 8 T. C. 1181.

In 1951 and 1952 petitioner recognized that conditions in the automobile business in the years following World War II were abnormal; that with the automobile manufacturers' tooling up to double and triple their output, conditions would necessarily become extremely competitive; that cash sales would continue to decline; that trade-ins and allowances on trade-ins would continue to increase; that credit sales would continue to increase, resulting in a corresponding growth in petitioner's notes and accounts receivable and also its contingent liability on sales financed through G. M. A. C.; that payments on credit sales would become slower; and that petitioner would have to increase the self-financed part of its inventory consisting of parts, accessories, and used cars.

Petitioner offered the testimony of an accountant connected with an accounting firm that audits the books and records for over 300 automobile dealers. He testified that in his opinion a business such as petitioner conducted required an average working capital for 1951 and 1952 of approximately $445,100. He reached this figure by estimating the average operating expenses [7] in 1951 and 1952 to be $201,300, the average inventories to be $104,300, and the average accounts and notes receivable to be $139,500, a total of $445,100. The accountant also testified that in his opinion, without reference to the future needs of petitioner's business and based on the fact petitioner was carrying so much slow paper, a ratio of current assets to current liabilities of from 3.5 to 1 or 4 to 1 would not be excessive. The actual ratio of current assets to current liabilities as of December 31, 1951, and 1952, as we have determined it, was 2.26 to 1 and 2.91 to 1, respectively, a much lower figure than that suggested by the accountant. We reached this figure by treating the amounts due from officers as current assets although they were not so shown on the balance sheets. It would seem, therefore, that from this test petitioner's accumulation of earnings or profits in the form of surplus in 1951 and 1952 was not unreasonable. It may be well to note that the greater part of petitioner's capital was in the form of surplus as its capital stock outstanding was only $25,000.

As set out in our findings, petitioner and the Chevrolet Motor Division of General Motors Corporation agreed on June 17, 1952, that based on actual conditions as they existed from November 1951 to

---

[7] This Court has consistently held that the accumulation of funds to meet operation expenses for at least 1 year is reasonable. *J. L. Goodman Furniture Co.*, 11 T. C. 530.

April 1952 petitioner must have as a minimum an owned net working capital of at least $226,754 and that at that time petitioner's total owned net working capital was $238,317, or only $11,563 in excess of the minimum that General Motors required. This agreement of June 17, 1952, provided in part that "The Dealer's failure to comply with this requirement constitutes a ground for termination of the current Chevrolet Selling Agreement." Certainly under such a contract it was not unreasonable for petitioner to accumulate sufficient earnings or profits to meet the minimum working capital required by General Motors or for that matter to exceed the "minimum" by a reasonable amount. See *Breitfeller Sales, Inc.*, 28 T. C. 1164.

The respondent stresses the withdrawals by the two principal stockholders of large sums earned in the taxable years and the absence of dividends through the years as proof that the funds were not reasonably needed in the business. Under some circumstances this might be persuasive, but here the principal stockholders were at all times ready and willing to repay the advances at any time they were needed for the construction of additional facilities and generally to finance greater inventories, for increased working capital, etc. Indeed, starting in 1953, repayments were commenced and by 1957 every dollar loaned by petitioner to Watkins was called in and promptly paid back to meet petitioner's business needs and, in addition, petitioner was required to borrow large sums from Watkins after which petitioner owed Watkins over $111,000 in excess of the amount which was owing to petitioner by Watkins' wife. Cf. *Corporate Investment Co.*, 40 B. T. A. 1156; and *Charleston Lumber Co.* v. *United States*, 20 F. Supp. 83, where loans to the taxpayer's two sole stockholders were not considered to evidence the interdicted purpose, inasmuch as the loans were bona fide and were repaid to the corporation in later years.

Considering both the present needs of petitioner and the necessity in the taxable years of accumulating funds to take care of the foreseeable needs of the future, to all of which Watkins gave positive testimony, we think petitioner has established that the retention of its earnings during the years 1951 and 1952 was to meet its business needs and the retention of the earnings was not to defeat the imposition of the surtax on its principal stockholders. The tax imposed by section 102 is a penalty tax and as a penalty it should not be imposed lightly. See *United Business Corporation of America*, 19 B. T. A. 809, 826, affd. 62 F. 2d 754 (C. A. 2). A capitalistic economy requires some freedom of action on the part of those engaged in it and the needs of a growing business of necessity must be determined by those engaged in its direction. In the instant case, events establish that every dollar retained in the business was needed in the business, if not at the moment then in the near future, and the judgment of petitioner's officers was fully proven.

We conclude that an accumulation of earnings or profits in the amount of $178,000 for physical expansion, $24,000 to meet petitioner's contingent liability on the G. M. A. C. balances, and approximately $240,000 for working capital, or a total of $442,000, was within the reasonable needs of petitioner's business as of December 31, 1951. Since petitioner's accumulation of earnings or profits in the form of surplus at that date was only $378,070, it is clear that the accumulation of earnings or profits by petitioner during the year 1951 was not beyond the reasonable needs of its business and that petitioner was not availed of for purposes of avoiding the surtax upon its shareholders within the meaning of section 102. We find that the same is true for the year 1952 in which year the reasonable needs of petitioner's business amounted to $443,258 [8] and its accumulation of earnings or profits in the form of surplus on December 31, 1952, was only $433,192.

Since the amounts reasonably needed in petitioner's business as of December 31, 1951 and 1952, amounted to more than the accumulation of earnings or profits in the form of surplus, we do not think the fact that petitioner paid no dividends during the years in question should subject petitioner to the penalty provided for in section 102. We think petitioner properly regarded the temporary loans to its stockholders as the equivalent of cash and as a current asset to meet the needs of the business as they arose.

The facts in this case are very much like the facts in *Breitfeller Sales, Inc., supra.* In our opinion in that case, we said:

It is true that up to the end of 1948, the latest year before us, not a single dollar of taxable dividends had ever been declared by petitioner, although as of the end of that period a surplus of almost half a million dollars had been accumulated of which over half was in marketable securities unrelated to petitioner's business. It is likewise true that during this time loans were made by petitioner to its sole stockholder. * * *

But we have made the finding which we think the record compels, that a reasonable requirement of the business then existed for these accumulations. The working capital needed to fulfill petitioner's agreement with General Motors coupled with the expenses of physical expansion and the continuing possibility that it might be required to finance a new dealership in the adjoining St. Albans territory are alone sufficient to account for all of the contemporary surplus. * * *

The evidentiary facts as shown by the record have been found in considerable detail. We do not believe it would serve any useful purpose to continue their discussion here. We think petitioner has shown by a clear preponderance of the evidence that it was not availed of for the purpose of preventing the imposition of the surtax upon its

---

[8]

| | |
|---|---|
| Physical expansion | $178,000 |
| 10 per cent of contingent liability | 25,258 |
| Working capital | 240,000 |
| | 443,258 |

shareholders, and that its earnings or profits were not permitted to accumulate beyond the reasonable needs of the business. The respondent's determination of section 102 liability is therefore rejected. See and compare *Helvering* v. *National Grocery Co., supra; Helvering* v. *Chicago Stock Yards Co., supra; J. L. Goodman Furniture Co.,* 11 T. C. 530; *Crawford County Printing & Publishing Co.,* 17 T. C. 1404; *Newman Machine Co.,* 26 T. C. 1030; and *Breitfeller Sales, Inc., supra.*

*Decision will be entered for the petitioner.*