LaSalle Trucking Company v. Commissioner.
La Salle Trucking Co. v. Commissioner
Docket No. 94987.
United States Tax Court
T.C. Memo 1963-274; 1963 Tax Ct. Memo LEXIS 68; 22 T.C.M. (CCH) 1375; T.C.M. (RIA) 63274; October 7, 1963
Adam Y. Bennion, for the petitioner. Thomas F. Greaves, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: The respondent determined deficiencies in petitioner's *69 income tax as follows: [1]
1955
$27,566.43
1956
26,730.57
1957
465.52
1955
$31,463.71
1956
30,456.12
1957
4,663.10 The deficiencies are the result of a number of adjustments, only two of which are in controversy, namely, (1) whether petitioner was availed of during the taxable years before us for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed within the meaning of sections 531 to 537 of the Internal Revenue Code of 1954, [2] and (2) whether amounts expended by petitioner for replacement engines, cabs and tanks for its trucks constituted current expenses or capital improvements. Findings of Fact Some of the facts have been stipulated and are found accordingly: Issue 1 Petitioner is a California corporation with its principal place of business located in San Diego, California. Petitioner maintains its *70 books and records and files its Federal income tax returns on a calendar year basis, and it uses the accrual method of accounting. For the taxable years 1955 to 1957, inclusive, petitioner filed corporate income tax returns with the district director of internal revenue at Los Angeles, California. From the date of its incorporation on June 20, 1947, up to the present time, petitioner has had outstanding 750 shares of common stock of a par value of $100 per share, or a total par value of $75,000. Such shares were issued originally to Eduardo L. LaSalle (hereinafter referred to as LaSalle) in exchange for the assets of his sole proprietorship which had been engaged in the trucking business as a common carrier. The business of the sole proprietorship was continued by the petitioner. From time to time prior to 1955, LaSalle made gifts of petitioner's stock to each of his 8 children. During the taxable years LaSalle owned 52 percent of petitioner's stock and his children owned in equal shares 48 percent of petitioner's stock. At all times since petitioner was incorporated and through the taxable years involved herein, LaSalle was petitioner's president and a member of the petitioner's *71 board of directors. LaSalle was responsible for obtaining the original hauling contracts, and he was the one who made the decisions with respect to the acquisition of equipment and the hiring and firing of personnel. It was understood and known that LaSalle ran the petitioner. During the taxable years 1955 to 1957, inclusive, petitioner's other officers and directors were all members of LaSalle's immediate family. The principal part of petitioner's business as a common carrier was hauling liquid petroleum products from San Diego, California, to Mexicali, Mexico, and other locations in Baja California, Republic of Mexico. Mexicali is approximately 125 miles west of San Diego. During the taxable years petitioner owned and used 20 to 24 petroleum tank trucks and realized substantial revenue from its petroeum hauling business. In addition, petitioner owned 2 or 3 trucks which were used in hauling dry freight on a small scale. Commencing on some undisclosed date after petitioner was incorporated, an open account was maintained on petitioner's books for LaSalle. Charges were made in the account for sums advanced to or for the benefit of LaSalle, and the account was credited from time *72 to time for payments made by or for LaSalle. The account had a debit balance at December 19, 1951, of $20,687.16, which amount was paid by LaSalle on that date. Various amounts were charged to the account during 1952, 1953 and 1954, and certain credits were entered during each of those years with the result that there was a net debit balance as of December 31, 1954, of $41,624.85. There were a few debits and credits to the account between January 1, 1955, and August 22, 1955, the net result of which was a reduction in the debit balance to $40,587.01. Between August 22, 1955, and December 31, 1957, no amounts were debited or credited to the open account. During the years 1953 to 1957, inclusive, LaSalle paid interest to petitioner on the outstanding balance in the open account in the amount of $819, $927, $1,190, $1,217 and $1,217, respectively. Prior to December 31, 1957, LaSalle did not execute and deliver to petitioner any promissory notes with respect to the amounts which appeared as debit entries in the aforementioned open account. In 1954 petitioner became aware of the fact that the Southern Pacific Railroad Company contemplated the construction of a petroleum pipeline from *73 Los Angeles, California, to Phoenix, Arizona, with a distribution center at Niland, California, some 45 miles from Mexicali, Mexico. If the pipeline was actually constructed, customers in Mexicali, Mexico, would be in a position to obtain petroleum products from Niland instead of San Diego, which at this time was the nearest terminal to Mexicali. Since a substantial part of petitioner's business was derived from operating a large number of trucks from San Diego to Mexicali, a trip of 125 miles, it was apparent to the officers and directors of petitioner that the pipeline could have a significant effect upon petitioner's business. The pipeline was started sometime in 1954 or 1955 and was completed in May 1956. As soon as work on the pipeline commenced, petitioner's officers and directors began to discuss means by which the adverse effect of the pipeline could be averted. For the most part the discussions took place at informal meetings of the officers and directors, although on at least one occasion the matter was discussed at a regular board of directors' meeting. The discussions centered on the feasibility of erecting a petroleum terminal in Niland in order that petitioner could *74 at least retain the business between Niland and Mexicali, and on the feasibility of expanding petitioner's dry freight business, which up to this point had been conducted on a small intrastate (California) scale. On May 5, 1955, petitioner filed an application with the Interstate Commerce Commission for a certificate of public convenience and necessity authorizing it to haul liquid petroleum products from points in San Bernardino and Imperial Counties to the Mexican border near Mexicali. The Interstate Commerce Commission granted petitioner the right to haul from Colton and Niland, California, to ports of entry on the international boundary between the United States and Mexico at or near Calexico, Tecate, and Andrade, California, and San Luis, Arizona. In June 1955 Frank LaSalle, an officer and director of petitioner, made a trip to the Niland area to see if a suitable site for construction of a terminal from an economic and geographic standpoint, was available in the area. Upon his return Frank recommended that a terminal be built in Niland. Based on the value of petitioner's terminal in San Diego, it was estimated that the cost of erecting a terminal in Niland would be approximately *75 $150,000. As indicated above, petitioner's officers and directors also gave consideration to expanding petitioner's dry freight hauling business. The matter of constructing or leasing a dry freight terminal in Los Angeles was discussed on several occasions. In addition, the directors of petitioner estimated that it would cost approximately $300,000 to acquire the necessary equipment for hauling dry freight. The $300,000 estimate was predicated on a belief that the dry freight business would require as large an investment in freight equipment as petitioner had in petroleum hauling equipment. Petitioner had approximately $300,000 invested in petroleum hauling equipment. It was originally contemplated by LaSalle that the expansion of the dry freight hauling business could be effected by the creation of a new operating subsidiary or division. However, sometime in the latter part of 1955, LaSalle was advised by his attorney that petitioner could not get rights from the Interstate Commerce Commission to transport dry freight across state lines, and that the Interstate Commerce Commission would probably deny approval to a new corporation if that corporation was owned by officers or directors *76 of petitioner. Discussions continued until the spring of 1956 when it was finally agreed that it would be impractical for petitioner to engage in the dry freight hauling business. At this same time the consensus of opinion among petitioner's directors was that a profitable freight business could be developed between Los Angeles and Baja California, that a new corporation should be formed to handle this business, and that efforts should be made to obtain the necessary permits to conduct such business. On August 3, 1956, a new corporation, known as LaSalle Freight Company, was formed under the laws of the State of California for the purpose of engaging in the dry freight hauling business. LaSalle Freight did not commence operations until 1958. Between 1958 and 1961 LaSalle Freight acquired and leased equipment having a total cost basis of $192,073.27. As matters turned out, a terminal at Niland was never constructed. During the taxable years LaSalle made frequent trips to Mexico, and while in Mexico he often heard recurrent rumors that the Mexican Government was planning to go into the business of hauling petroleum products. Although discussions continued among petitioner's directors *77 and officers in connection with the construction of a terminal in Niland, LaSalle in 1957 became increasingly worried about the possibility of a Mexican company being formed and its adverse effect upon petitioner's business. Because of this uncertainty, sometime in 1958 petitioner abandoned the idea of erecting a terminal in Niland. On June 7, 1955, petitioner's board of directors approved the declaration of a dividend in the amount of $25,000. From the date of petitioner's incorporation until the close of the year 1957, this was the only dividend ever declared by petitioner. LaSalle Enterprises was a limited partnership organized on May 1, 1955, by the LaSalle family for the purpose of engaging in the business of repairing and servicing automotive equipment. Its initial capital was $30,000. In September 1955, petitioner sold its real property and the improvements thereon located in San Diego to LaSalle Enterprises for $100,000. The purchase price consisted of a cash payment of $20,878.65, the assumption of a mortgage in the amount of $49,121.35, and the execution of a second mortgage in the amount of $30,000 payable in the amount of $300 per month. LaSalle Enterprises, in October *78 1955, leased the property back to petitioner at a monthly rental of $1,500. The rate of $1,500 per month was paid during the taxable years involved herein, i.e., from October 1955 to December 1957. As a result of the sale of the real property to LaSalle Enterprises, petitioner converted $100,000 of fixed assets into cash of $20,878.65 and a long-term note receivable of $30,000. [3]
On December 27, 1956, petitioner's board of directors adopted a pension plan for petitioner's salaried employees who were not members of the Teamsters Union and covered by the latter's pension plan. On the same day the directors of petitioner authorized petitioner to enter into a contract with Haegen Associates, Inc., under which the latter would handle the establishment of the pension plan and secure its approval by the Internal Revenue Service. On this same day, petitioner executed the LaSalle Trucking Company Employees' Retirement Trust and the LaSalle Trucking Company Employees' Retirement Plan. The retirement plan provided for an effective date of January 1, 1956, and provided for past service benefits for employees based upon the number *79 of years of continuous service from the dates of their employment by the company to and including December 31, 1955. It was estimated by petitioner that the cost of funding the past service benefits under this plan would exceed $100,000. Accordingly, petitioner established as a liability on its books at December 31, 1956, the sum of $136,443.05 as "accrued pension plan contribution." The figure of $136,443.05 represented $121,381 for past service benefits and $15,062.05 for current 1956 costs. Petitioner intended to fund the past service benefits under the retirement plan with cash as soon as approval of the plan was obtained from the Internal Revenue Service. The advantage petitioner hoped to derive by initially funding the prior service benefits was to save the interest which is charged on the unfunded service cost. [4] The petitioner's retirement plan was approved by the Internal Revenue Service on February 28, 1958. The sum of $120,753.70 for funding the past service benefits was contributed in cash to the Retirement Trust as follows: December 27, 1956, $100; March 12, 1957, $12,038.10; July 9, 1957, $15,000; and July 7, 1958, $93,615.60. On its 1956 income tax return petitioner *80 deducted pension plan costs in the sum of $26,880.10 which included 10 percent of the cost of prior service benefits, or $12,138.10. LaSalle, petitioner's president, was a financially aware individual who was interested in tax planning and in the minimizing of his taxes. During the years 1955 to 1957, inclusive, LaSalle consulted with his accountant on numerous occasions relative to tax planning matters and, in particular, about his estate plan. In an effort to reduce LaSalle's estate taxes, a plan was devised whereby petitioner would declare a dividend in preferred stock, and LaSalle would thereafter make gifts to his children of the preferred stock received by him. Thus, upon completion of the two transactions, LaSalle's estate would be considerably reduced while at the same time LaSalle's control over petitioner would remain unchanged. On November 26, 1957, petitioner amended its Articles of Incorporation to provide for an additional *81 class of stock, namely $100 par value 6% nonaccumulative preferred stock. Pursuant to a resolution adopted at the board of directors' meeting of petitioner on November 29, 1957, petitioner distributed 3,000 shares of such preferred stock to its common shareholders and thereafter transferred $300,000 from earned surplus to capital. LaSalle received 1,560 shares of preferred stock. During the years 1957 and 1958 LaSalle made gifts of this stock to his children. During the years 1955 to 1957, inclusive, LaSalle filed joint. Federal income tax returns with his wife, Carmen T. LaSalle, and reported taxable income thereon which put them in the tax bracket of 50 percent, 47 percent and 50 percent, respectively. The following are petitioner's comparative balance sheets for the years 1952 to 1957, inclusive: Assets
12-31-52
12-31-53
12-31-54
Cash
$ 49,401.12
$ 15,303.96
$ 63,225.69
Notes and accounts re-
ceivable
82,437.43
123,271.30
96,028.01
Reserve for bad debts
(303.14)
(1,815.40)
(1,073.11)
Prepaid expenses
8,709.68
9,443.59
Materials and supplies
7,941.53
10,785.03
10,895.16
Land
6,757.69
31,864.02
31,864.02
Buildings and other fixed
depreciable assets
429,452.36
448,489.77
495,355.50
Allowance for deprecia-
tion
(257,486.40)
(228,371.33)
(267,239.62)
Other assets
18,663.10
16,600.95
6,380.72
Total assets
$345,573.37
$416,128.30
$444,879.96
Liabilities and Capital
12-31-52
12-31-53
12-31-54
Accounts payable
$ 55,442.64
$ 43,411.26
$ 51,939.64
Bonds, notes and mort-
gages payable - Cur-
rent
23,300.00
Bonds, notes and mort-
gages - Long term
32,874.98
64,799.74
Accrued expenses
16,991.62
17,067.77
13,759.74
Income taxes payable
3,014.78
10,781.77
36,393.93
Other liabilities
413.11
413.11
413.11
Capital stock: Common stock
75,000.00
75,000.00
75,000.00
,preferred stock
Surplus reserve
1,850.00
Earned surplus and un-
divided profits: Beginning of year
149,961.91
161,836.24
204,654.65
Net income
11,874.33
42,818.41
37,568.89
Dividends paid
End of year balance
$161,836.24
$204,654.65
$242,223.54
Total liabilities and capi-
tal
$345,573.37
$416,128.30
$444,879.96
*82 Assets
12-31-55
12-31-56
12-31-57
Cash
$171,857.14
$266,808.85
$262,860.95
Notes and accounts re-
ceivable
150,207.57 [1]
129,498.84 [2]
139,196.33 [3]
Reserve for bad debts
(1,570.32)
(1,570.32)
(1,554.26)
Prepaid expenses
20,784.50
131,967.63 [4]
105,076.55 [5]
Materials and supplies
Land
Buildings and other fixed
depreciable assets
474,240.41
470,801.28
409,474.04
Allowance for deprecia-
tion
(292,780.39)
(329,945.85)
(293,329.55)
Other assets
6,669.40
7,669.40
6,919.40
Total assets
$529,408.31
$675,229.83
$628,643.46
Liabilities and Capital
12-31-55
12-31-56
12-31-57
Accounts payable
$ 79,958.11
$ 48,229.09
$ 28,746.06
Bonds, notes and mort-
gages payable - Cur-
rent
17,306.25
1,331.25
Bonds, notes and mort-
gages - Long term
Accrued expenses
15,377.74
151,723.13 [6]
124,328.23 [7]
Income taxes payable
60,854.99
32,661.64
11,856.58
Other liabilities
413.11
413.11
413.11
Capital stock: Common stock
75,000.00
75,000.00
75,000.00
,preferred stock
300,000.00
Surplus reserve
1,850.00
1,850.00
1,850.00
Earned surplus and un-
divided profits: Beginning of year
242,223.54
295,954.36
348,046.61
Net income
78,730.82
52,092.25
37,071.62
Dividends paid
(25,000.00)
(300,000.00) [8]
End of year balance
$295,954.36
$348,046.61
$ 85,118.23
Total liabilities and capi-
tal
$529,408.31
$675,229.83
$628,643.46
*83 Petitioner's gross income, total expenses and taxable income per its income tax returns for *84 the years 1955 to 1957, inclusive, were as follows: Gross
Total
Taxable
Year
Income
Expenses
Income
1955
$796,730.34
$665,637.22
$131,093.12
1956
823,226.49
749,426.52
73,799.97
1957
721,343.64
676,734.38
44,609.26
The taxable income of petitioner consisted in part of net operating profit and in part of gains from the sale of equipment and real property, as follows: Operating
Gains on Sale of
Taxable
Year
Profit
Equipment, Etc.
Income
1955
$118,628.07
$12,465.05
$131,093.12
1956
73,006.12
793.85
73,799.97
1957
14,085.26
30,524.00
44,609.26 Petitioner's working capital and operating expenses at the end of each of the taxable years were as follows: Working
Operating
Year
Capital [5]
Expenses
1955
$158,874.94
$665,637.22
1956
144,928.88
749,426.52
1957
222,699.54
676,734.38
*85 The current ratios (the current assets divided by the current liabilities) of several large trucking companies during the years 1955 and 1956 were as follows: Company
1955
1956
Associated Transportation,
Inc.
2.65 to 1
2.64 to 1
Columbia Terminal Co.
2.20 to 1
1.79 to 1
Brinks, Inc.
2.21 to 1
2.27 to 1
McLean Trucking
2.36 to 1
1.92 to 1
Consolidated Freightways,
Inc.
1.90 to 1
1.79 to 1
Transcon Lines
2.41 to 2.33 to 1
Petitioner's ratio of current assets to current liabilities at the end of the years 1955, 1956 and 1957 was 2.01 to 1; 1.57 to 1; and 2.33 to 1, respectively (see footnote 5). By notice dated August 15, 1960, respondent advised petitioner that a tax was proposed to be asserted under section 531 for the years 1955, 1956 and 1957. Pursuant to an extension of time to November 13, 1960, petitioner on November 9, 1960, pursuant to section 534(c), filed with the Internal Revenue Service a timely statement (herein incorporated by reference) setting forth grounds on which it relies to establish that its earnings and profits had not been permitted to accumulate beyond the reasonable needs of its business. Subsequent to the receipt *86 of such statement, the respondent issued a statutory notice in which he determined that petitioner was liable for the tax under section 531 for the years 1955, 1956 and 1957. During the taxable years 1955 and 1956 petitioner did not permit its earnings and profits to accumulate beyond the reasonable needs of its business. Petitioner was not availed of in its taxable years 1955 and 1956 for the purpose of avoiding the income tax with respect to its shareholders by permitting its earnings and profits to accumulate instead of being divided or distributed. The reasonable needs of petitioner (including the reasonably anticipated needs) did not require the accumulation of any of the corporation's earnings and profits for the taxable year 1957. Petitioner in 1957 was availed of for the purpose of avoiding income tax with respect to its shareholders by permitting its earnings to accumulate instead of being divided or distributed. Issue 2 Petitioner during the years 1955 and 1956 operated 20 to 24 petroleum hauling trucks. Each of the trucks was driven approximately 100,000 miles a year and was depreciated by petitioner over a useful life of 6 years. During the life of a truck *87 it would be necessary to completely overhaul its engine 2 or 3 times. A major overhaul would involve replacing almost all parts of the engine except the block, which would not be replaced unless broken or cracked. Actually, when an engine needed an overhaul, the truck was brought into the shop, the old engine was removed and a replacement engine, either a new or rebuilt one, was installed in its place. This practice of replacing the old engine was established in order to shorten the time a truck was tied up in the shop. The old engine was then overhauled if the block was in good condition and used as a replacement engine for the next engine needing an overhaul. In addition to replacing engines, petitioner from time to time replaced the petroleum tanks and cabs on its trucks. The petroleum tanks and cabs were both interchangeable and it was possible for them to last 6 years. A new engine cost approximately $5,000, a new cab approximately $1,700 and a new tank about $1,800. A new truck cost between $16,000 and $17,000. During 1955 petitioner deducted as repairs the cost of 3 engines and 4 tanks. The total cost of these items was $22,380.10. In 1956 petitioner deducted as repairs *88 the cost of 2 engines, 2 cabs and 4 tanks. The total cost of these items was $20,647.08. The respondent disallowed the deduction for both years on the ground that said items represented capital expenditures. Opinion Issue 1 Sections 531 and 532 impose an additional tax designated as an accumulated earnings tax upon a corporation formed [6] or availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting its earnings and profits to accumulate beyond the reasonable needs of its business. Whether a corporation was availed of for the purpose of avoiding the income tax with respect to its shareholders and whether earnings and profits were permitted to accumulate beyond the reasonable needs of the business are questions of fact. Helvering v. Nat. Grocery Co., 304 U.S. 282 (1938); James M. Pierce Corporation, 38 T.C. 643, 652 (1962); F. E. Watkins Motor Co., 31 T.C. 288 (1958); Lion Clothing Co., 8 T.C. 1181 (1947). Section 534 casts the burden on respondent with respect to the issue of accumulation *89 beyond the reasonable needs if the petitioner submits a statement of the grounds and facts on which it relies to show that there was no accumulation beyond the reasonable needs of its business. Although petitioner filed such a statement and set forth its reasons for the accumulation, together with facts purportedly in support of said reasons, respondent has taken the position that petitioner's statement is inadequate to shift the burden of going forward with the evidence to respondent on the theory that the grounds set forth therein are not supported or are contradicted by the facts contained in said statement. After examining the petitioner's 534 statement and studying the respondent's arguments as to the claimed insufficiency of the statement, we conclude that the statement meets the general purpose and intent of the statute and thereby shifts the burden of proof to the respendent with respect to the grounds alleged therein. Based upon the record as a whole, we have found as an ultimate fact that petitioner's earnings were not permitted to accumulate beyond the reasonable needs of its business for the years 1955 and 1956 and further that petitioner was not during 1955 and 1956 *90 availed of for the purpose of preventing the imposition of income tax on its shareholders. We have also found as an ultimate fact that petitioner's earnings for 1957 were permitted to accumulate beyond the needs of its business and that petitioner during 1957 was availed of for the purpose of preventing the imposition of income tax on its shareholders. We deem it unnecessary to review in detail the evidence upon which these findings are predicated. We shall merely point out some of the salient features of the record and note our conclusions with respect thereto. The record discloses that beginning in 1954 petitioner's business was definitely threatened and ultimately affected by Southern Pacific Railroad's pipeline between Los Angeles and Phoenix. In an effort to avert or minimize this competitive threat to its business, petitioner's officers and directors considered two courses of action, namely, the erection of a terminal at Niland, California, and the expansion of petitioner's dry freight hauling business. Petitioner's directors estimated that the combined cost of these two ventures would be approximately $450,000. This estimate was not a matter of pure speculation but was an *91 educated "guesstimate" premised on experience acquired through the acquisition of petitioner's Los Angeles terminal and its petroleum hauling equipment. In addition, the intention to acquire a Niland terminal was not only evidenced by numerous formal and informal discussions by petitioner's directors, a circumstance which is entitled to some weight, see James M. Pierce Corporation, supra, at page 654, but was manifested by concrete and definite action on the part of the petitioner and its officers. On May 5, 1955, petitioner filed an application with the Interstate Commerce Commission for a certificate of public convenience and necessity which would authorize it to haul petroleum products to the Niland area. In June 1955 one of the petitioner's officers made a trip to the Niland area and spent several days there looking for a suitable terminal site. The petitioner's directors and officers did not abandon their intention to expand the dry freight business until sometime in 1956 and did not abandon their intention to build the Niland terminal until sometime in 1958. So long as petitioner reasonably intended to build the terminal and to expand its dry freight business, it *92 had a right to curtail the disposition of its resources and to set aside a fund for that purpose. Breitfeller Sales, Inc., 28 T.C. 1164 (1957); Reynard Corporation, 37 B.T.A. 552 (1938). In addition to the capital requirements discussed above, the record reveals that in 1956 petitioner's directors established a pension plan for petitioner's salaried employees and declared an intention to fund prior service benefits as soon as the pension plan was approved by the Internal Revenue Service. The cost of funding such prior service benefits was approximately $120,000. Petitioner's officers and directors concluded in good faith that petitioner should retain earnings to provide funds for the purpose of liquidating its obligation to the pension trust. The fact that petitioner's directors chose to use petitioner's resources to liquidate an obligation or to expand, rather than for dividends, is a business policy to be determined only by the sagacity and discretion of petitioner's officers and directors. See and compare J. L. Goodman Furniture Co., 11 T.C. 530 (1948); Lion Clothing Co., supra; General Smelting Co., 4 T.C. 313 (1944); *93 Dill Manufacturing Co., 39 B.T.A. 1023 (1939). We have also considered and given some weight to petitioner's working capital position and current ratio during the taxable years. The record discloses that the petitioner's working capital was not excessive in view of its operating costs, and its current ratios compared favorably with those of other trucking companies during the same period. Such factors may be considered in determining whether or not earnings have been unreasonably accumulated. F. E. Watkins Motor Co., supra; Wellman Operating Corporation, 33 T.C. 162 (1959); Kerr-Cochran, Inc., 30 T.C. 69 (1958); Oyster Shell Products Corporation, Inc. v. Commissioner, 313 F. 2d 449 (C.A. 2, 1963) affirming a Memorandum Opinion of this Court; J. L. Goodman Furniture Co., supra; James M. Pierce Corporation, supra; and Lion Clothing Co., supra. In view of the foregoing, we have concluded that during 1955 and 1956 when petitioner's accumulated earnings were $295,954.36 and $348,046.61, respectively, the exigencies of petitioner's business justified the retention of these earnings. *94 However, the same conclusion is not possible for the year 1957. The respondent introduced evidence which showed that by the end of 1956 petitioner had abandoned its intention to expand its dry freight business. While the abandonment of this phase of petitioner's expansion program substantially reduced petitioner's capital needs as of the end of 1956, we have concluded and previously noted that in view of petitioner's other needs a surplus of $348,046.61 as of the end of 1956 was not unreasonable. The question then becomes: Did petitioner need to accumulate in addition its 1957 earnings to meet the current and anticipated needs of its business? We think that it did not. Petitioner's accumulated earnings as of December 31, 1956, were quite sufficient to absorb its reduced expansion program, its pension funding program and its working capital requirements. Furthermore, petitioner offered no evidence that during 1957 it was considering and had specific plans for additional avenues of business expansion. Under such circumstances, we believe that in the absence of such contravening evidence the respondent has sustained his burden of showing that petitioner was not required to accumulate *95 further earnings from the year 1957 to meet its needs. See and compare Electric Regulator Corporation, 40 T.C. - (July 31, 1963). There remains the ultimate question: Whether petitioner was availed of during the taxable years for the purpose of preventing the imposition of income taxes upon its shareholders by permitting its earnings to accumulate instead of being divided or distributed. The petitioner has the burden of proof as to this issue. Electric Regulator Corporation, supra; Nemours Corporation, 38 T.C. 585 (1962). As to the years 1955 and 1956, we believe that petitioner's motives for the accumulations were geared to its reasonable corporate needs and not to any desire to avoid the imposition of taxes on its shareholders. It would serve no useful purpose to repeat the evidentiary facts which we have found and which we have discussed above. For the year 1957 we have found that the earnings of petitioner for that year were accumulated beyond the reasonable needs of its business. Section 533 provides that such a fact shall be determinative of the purpose to avoid the income tax with respect to shareholders unless the petitioner by a preponderance of the evidence *96 shall prove to the contrary. Since petitioner's needs in 1957 were for the most part less than those of 1955 or 1956, petitioner has failed to show by a preponderance of the evidence that it was justified in retaining earnings of $37,071.62 which were accumulated during 1957. Consequently, we hold that under the facts of this case, petitioner was availed of during 1957 for the purpose of preventing the imposition of income tax upon its shareholders. Issue 2 This issue concerns the tax treatment to be accorded amounts expended for the replacement of engines, petroleum tanks and truck cabs in the petitioner's truck fleet. The respondent contends that such expenditures were capital in nature and, therefore, not deductible in full as repair expenses. Petitioner argues that since such expenditures were made for the sole purpose of keeping its truck in operation during their normal useful life of 6 years, they are deductible as repairs. The issue is one of fact and the burden is upon the petitioner to prove that respondent erred in his determination. In Illinois Merchants Trust Co., Executor, 4 B.T.A. 103, 106 (1926) we stated: A repair is an expenditure for the purpose *97 of keeping the property in an ordinarily efficient operating condition. It does not add to the value of the property, nor does it appreciably prolong its life. It merely keeps the property in an operating condition over its probable useful life for the uses for which it was acquired. We also noted that replacements or improvements prolong the life of the property, increase its value or make it adaptable to a different use. Petitioner's bookkeeper, who was formerly petitioner's truck dispatcher, testified that an engine lasted several years and that both the replacement cab and the replacement petroleum tank lasted approximately 6 years. The record also disclosed that the total cost of a new engine, cab and tank was approximately $8,500, and that a new truck cost $16,000 to $17,000. In view of this evidence, we find it difficult to believe that the life of a truck was not extended and its value not increased by the installation of a new engine, cab and tank. The ipse dixit of petitioner's witness that the replacements did not extend the life of the truck is not sufficient under such circumstances to sustain the burden of proof cast upon petitioner. Furthermore, there is considerable *98 evidence in the record to warrant a finding that the replacement items under the circumstances of this case were independent capital assets. Each of the items had a useful life in excess of 1 year, was of an interchangeable nature, and was, in fact, on occasion treated as a substitute or stand-by component. In First National Bank of St. Louis, 3 B.T.A. 807 (1926), we held that amounts paid for assets that are to continue in use in the petitioner's business over several years are usually classified as capital items and the sums paid therefor are recoverable over the life of the asset. See also Leedom & Worrall Co., 10 B.T.A. 825 (1928), and H. S. Crocker Co., Inc., 15 B.T.A. 175 (1929). For the reasons set forth above, we held that the amounts expended by petitioner in 1955 and 1956 for replacement engines, tanks and cabs are not deductible as repairs. Respondent is sustained on this issue. Decision will be entered under Rule 50. Footnotes
1. The respondent by amended answers seeks increased deficiencies in the following amounts:↩
2. Unless otherwise indicated, all section references will be to the Internal Revenue Code of 1954.↩
3. Petitioner also reduced its liabilities by $49,121.35.↩
4. The principal advantage of funding prior service benefits is actually derived by the participants in the plan due to the fact that the funded amounts earn current tax-free income which inures to the ultimate benefit of the plan's participants.↩
1. $25,800 of the total accounts receivable was due in excess of 1 year from date of statement. ↩
2. $22,200 of the total accounts receivable was due in excess of 1 year from date of statement. ↩
3. $19,100 of the total accounts receivable was due in excess of 1 year from date of statement. ↩
4. $109,242.90 of the total prepaid expenses represents alleged funding of prior service benefits under petitioner's pension plan as of December 31, 1956. ↩
5. $97,104.80 of the total prepaid expenses represents alleged funding of prior service benefits under petitioner's pension plan as of December 31, 1957. ↩
6. $136,443.05 of the total accrued expenses represents the total estimated accrued pension plan liability for prior and current service benefits as of December 31, 1956. ↩
7. $109,225.50 of the total accrued expenses represents the total estimated accrued pension plan liability for prior and current service benefits as of December 31, 1957. ↩
8. The amount of $300,000 shown as "dividends paid" represents a dividend of preferred stock which was declared and distributed on November 29, 1957.↩
5. Accounts receivable due more than 1 year from the date of the petitioner's balance sheet and "prepaid expenses" attributable to the pension fund have been excluded in the determination of working capital and in the calculation of the petitioner's current ratios. In addition, because of management's intention to fund the prior service benefits of its pension plan as soon as the plan was approved by Internal Revenue Service, the amount of such prior service benefits has been treated as an accrued current liability for purposes of computing petitioner's working capital and current ratios.↩
6. Respondent does not contend that petitioner was formed for the proscribed purpose.↩