Fotocrafters Incorporated v. Commissioner.
Fotocrafters, Inc. v. Commissioner
Docket No. 68464.
United States Tax Court
T.C. Memo 1960-254; 1960 Tax Ct. Memo LEXIS 37; 19 T.C.M. (CCH) 1401; T.C.M. (RIA) 60254; November 29, 1960
Harry A. Morris, Esq., 915 Grand Ave., Kansas City, Mo., and William B. Bundschu, Esq., for the petitioner. Sylvan Siegler, Esq., for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent determined the following deficiencies in petitioner's income tax: Fiscal Year End-
Section 531
ing March 31
Deficiency
Surtax [1]
1954
$13,318.89
$1,946.56 [2]
1955
11,011.50
4,434.73
1956
9,812.28
3,563.89
The issues for our determination are: (1) Whether the salaries paid to petitioner's president and principal stockholder during the years in issue are reasonable in amount and hence deductible under section 23(a)(1)(A) of the 1939 Code and section 162(a)(1) of the 1954 Code; and (2) whether petitioner is liable for an accumulated earnings tax under section 102 of the 1939 Code and section 531 of the 1954 Code because it was availed of to avoid the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided *40 or distributed. Findings of Fact General Some of the facts have been stipulated, are so found and are incorporated herein by this reference. Petitioner is a corporation organized under the laws of the State of Missouri on April 2, 1947. It kept its books on an accrual method of accunting and filed its Federal income tax returns on a fiscal year ending March 31. Its returns for the years in issue were filed with the now director of internal revenue at Kansas City, Missouri. Issue 1. Salaries The prime motivating force behind petitioner has always been Joseph J. Enright, Jr., hereinafter referred to as Enright. Petitioner is engaged in the business of photofinishing (printing and developing of film). Enright started in this field in 1933 doing odd jobs at nominal wages for Elko Photo Products Company (hereinafter referred to as Elko) which was then in the field of printing and developing black and white film in the Kansas City area. Enright worked his way up through the Elko organization and by 1936 had achieved the position of manager in charge of general operations of one of Elko's branches. In so doing he gained valuable experience in all phases of the photofinishing *41 business and by 1942, when he enlisted in the Navy, he was earning approximately $350 per month plus expenses. In the Navy, Enright was assigned to a photographic unit in which there were several other men with extensive and varied backgrounds in the field of photography. Here he learned much about technical aspects of photography and also became adept in the use of color film processes which were employed by the Navy in its intelligence work but which were not then available to the general public. Enright was discharged from the Navy in September 1945 and the next month returned to Elko. About 1 year later when Enright was earning $500 per month, Elko decided to embark upon a retail camera venture and to leave the photofinishing field. Enright took this opportunity to leave the employ of Elko and to enter the photofinishing field for himself, using about $9,000 of his personal savings to buy the needed equipment. Katz Drug Company (hereinafter referred to as Katz), a large chain drug store whose photofinishing work had been done by Elko, offered Enright a position within its organization as photofinisher at $10,000 per year, but satisfactory terms could not be reached. Thus, *42 Enright started out for himself with Katz as a customer on an informal day-to-day basis, no contract ever existing between them, or later, between Katz and petitioner. Enright's actual operations commenced about January 1947 at which time he formed a partnership with George Reynolds, another former Elko employee. In April 1947 petitioner was formed with $500 initial capital being paid in by Enright for 500 shares of stock; then on May 1, 1947, petitioner's board of directors accepted the partnership's offer to sell its assets to petitioner in return for 8,024 shares of stock. On May 2, 1947, the transfer occurred and Enright received 7,024 shares of stock and Reynolds 1,000 shares. Enright thus became the owner of 7,523 shares of petitioner's stock with Salvatore J. Salpietro (Sal) owning 1 qualifying share. Enright had charge of general management, selling, printing, enlarging and various other duties. Reynolds' role was to train the personnel and to direct production. Enright and Reynolds agreed that each would draw $50 a week as salary plus an end-of-year bonus "which would depend on the condition of the company at that time." For the fiscal year ending March 31, 1948, Enright *43 received $4,975 and Reynolds received $4,825. On March 5, 1948, Reynolds announced his desire to withdraw from petitioner altogether. On the same day petitioner's board of directors accepted Reynolds' resignation and paid him $1,000 for his stock and $2,600 additional compensation (included in the $4,825) under the terms of a previous understanding. On May 1, 1948, Enright gave his brother, James A. Enright (James) 1 share of petitioner's stock so that from that date and throughout the entire period here involved the outstanding capital stock was held as follows: Name
Number of Shares
Enright
7,522
James
1
Sal
1
7,524 Throughout the entire period here involved Enright, James and Sal have served as petitioner's three directors, Enright has been president-treasurer and Sal and James have alternated between the positions of vice president and secretary. Upon Reynolds' departure, Enright assumed all of his duties in addition to those which he had been performing. For the fiscal year ending March 31, 1949, Enright drew only $3,520, computed at $100 per month, plus a year-end bonus. For the following fiscal year the stockholders voted to increase Enright's *44 annual salary to $10,000 but Enright drew only $5,000 for that year with no bonus. In January 1951 the board of directors met and voted to give all nonofficer employees a Christmas bonus commencing the following Christmas and to continue a system of merit increases for such employees. The board also initiated a bonus system designed to compensate the officers equally according to a graduated scale based on a percentage of corporate net income before taxes. This scale was not followed, for in the fiscal year ending March 31, 1951, Enright received a bonus of $4,950 (bringing his total compensation to $12,500), but Sal and James received bonuses of only $1,500 each. These bonuses were computed without reference to profits and were designed to reward the officers of the company according to the value of their services. For the fiscal years ending March 31, 1952 and 1953, the bonus plan was altered so that the three officers received equal bonuses (totaling each year 30 per cent of the net profits before taxes) in order to compensate Sal and James for their past services before Enright's past services were fully rewarded. The bonuses to each officer were: Fiscal Year Ending
Amount
March 31, 1952
$4,491.11
March 31, 1953
4,763.15
*45 Enright's total compensation for these 2 years was $14,971.11 and $17,783.15, respectively. Petitioner's first and (to date of trial) only dividend amounting to $1 a share was declared on December 15, 1952, and paid on December 31, 1952. During the early years of petitioner's business Enright discovered that operations could be materially improved if they could develop an inexpensive means of providing 1-day service to customers. The major obstacle had been the delay attendant upon the "make-over" problem caused by errors in exposure of the negative the first time it was processed. By 1951, Enright had perfected a device (known as a "coding device") which (1) substantially alleviated the "make-over" problem by recording the exposure actually used, and (2) printed the date of development on all prints. The first feature helped to speed up operations, reduce petitioner's operating costs and improve the quality of the prints; the second feature created an immediate customer demand and helped to increase sales volume. In September 1952, Enright described his invention in the trade's national magazine and the device thereby attracted national attention. The invention was widely *46 acclaimed and was a boon to the entire industry.sometime in 1952 petitioner entered into the manufacture and sale of this device, petitioner receiving all the proceeds. In August 1953, Enright applied for a patent on the device, and the patent was granted in January 1958. The net sales, gross profit and net income of petitioner steadily increased from its inception as follows: Year
Ended
Gross
Net
March 31
Net Sales
Profit
Income
1948
$ 74,687.20
$ 27,965.41
$ 4,585.20
1949
129,205.71
46,616.37
21,143.98
1950
131,247.54
51,786.88
13,502.53
1951
150,083.31
66,853.53
22,667.59
1952
196,267.82
94,626.63
30,717.72
1953
245,826.18
106,884.14
32,942.00
1954
288,581.27
124,824.86
33,628.20
1955
288,079.70
129,980.19
42,708.21
1956
287,606.65
121,759.50
35,176.64
1957
329,439.62
198,226.22
31,197.92
1958
412,107.23
176,379.19
25,634.90
To provide a bonus system which was more equitable in light of the substantially greater value of Enright's services (as compared to those of James and Sal), the earlier plan was revised in April 1953, and for the fiscal years ending March 31, 1954, 1955, and 1956 (the 3 years here *47 in issue), the same 30 per cent of the profits was set aside for bonuses but it was divided: Enright one-half, Sal and James one-fourth each. The board at the same time raised Enright's salary to $26,000, per annum. Thus Enright's compensation for the fiscal years in issue was: Total
Year
Salary
Bonus
Compensation
1954
$26,000
$ 7,411.51
$ 33,411.51
1955
26,000
9,022.42
35,022.42
1956
26,000
7,890.21
33,890.21
$78,000
$24,324.14
$102,324.14
When petitioner decided to enter the color film field in 1953, as hereinafter described, the many duties connected with such expansion devolved upon Enright. Enright's services throughout petitioner's history have been unique and his functions were more numerous and varied than those of other executives in the industry. The compensation, including bonuses, paid to Enright for each of the years in issue was reasonable in amount. Issue 2. Accumulated Earnings During 1953 it became apparent to all the firms in petitioner's industry that the antitrust section of the Department of Justice was extensively investigating the alleged monopolistic practices of Eastman Kodak Company (hereinafter called *48 Eastman) in tying up all the color film processes. Everyone was aware that Eastman would soon be compelled to make these processes available to the entire industry. Enright was thus advised that he should prepare to enter the color field as soon as practicable. Katz advised Enright that it had to keep pace with its competitors and that it could not continue business relations with petitioner unless petitioner could provide color film service. Enright made inquiries and was advised by Eastman and other reliable sources in the industry that it would cost $150,000 to $200,000 to enter the color field and that losses should be expected for about the first 2 years of operations. During the years in issue the percentage of petitioner's sales volume constituting sales to Katz Drug Company, and other chain and independent drug stores (none of which was on a contract basis) was as follows: Year Ending
March 31
Katz
Crown
Parkview
Total
Other
Total
1954
63.9
23.3
9.9
97.1
2.9
100.0
1955
66.5
19.6
10.0
96.1
3.9
100.0
1956
73.7
6.4 *
11.0
91.1
8.9
100.0
Enright advised his board *49 of directors of the compelling need to enter the color field and of the danger of losing the major source of revenue if petitioner remained static. Thus, in 1953 the board decided to postpone dividends for the time being. The board recognized a need to remain in a liquid position and thus kept much capital in the form of Government bonds and certificates of deposit. On December 21, 1954, a consent decree was filed by Eastman wherein all of its color reproduction processes, equipment, technical information and data, previously protected by patents, were to be made available to persons desirous of entering into the printing of color film. The equipment needed was altogether different from that used in conventional black and white film processing and the color processing had to be conducted in air-conditioned premises. Enright had tried to place an order with Eastman for the needed equipment in November 1954 when the consent decree appeared imminent and was able to place part of his order in March 1955. Equipment began arriving January 1956 and by the end of March 1956, petitioner had been billed for over $28,000 worth of equipment for the color processing. When petitioner's need *50 for entry into the color field arose it also became apparent that the then leased premises on which petitioner processed black and white film was totally inadequate and could not provide the space needed for the color operation or to develop other accounts in order not to be so reliant upon Katz. Accordingly, petitioner authorized Enright to negotiate the purchase of new quarters and Enright, starting in 1953, made several efforts to secure a building. Fifty thousand dollars was earmarked for the acquisition of new quarters. Finally, after being frustrated in its attempts to secure a new building, petitioner entered into a 1-year lease of premises on Troost Avenue in January 1956 to start the color operation on a trial basis. The color equipment was delivered to this address. Petitioner continued to conduct its black and white operations at another location. Petitioner also had to air condition and revamp the Troost Avenue building to get it ready for color processing and spent about $8,000 in so doing. This equipment could not be used when petitioner gave up these temporary quarters in 1957. Finally, in January 1957, Enright located a building in Kansas City, Kansas, suitable to *51 the color processing operation and petitioner authorized its purchase for $45,000. Petitioner then formed its wholly owned subsidiary, "Rainbow Color Film Service, Inc.," organized under the laws of Kansas, to take over the color operation and abandoned its Troost Avenue premises. The subsidiary was formed with $125,000 of capital paid in by petitioner. By that time petitioner had spent over $88,000 for new plant and equipment. During the years in issue and immediately thereafter petitioner's current assets, current liabilities, working capital, operating expenses, working capital ratios, and quick assets were as follows: Fiscal Year
Ending March 31,
1954
1955
1956
1957
1958
Current Assets: General cash
$ 43,180.07
$ 71,410.98
$ 56,919.11
$ 30,116.79
$64,037.15
account
Payroll cash
6,230.49
2,927.22
7,046.57
8,063.24
2,984.78
account
U.S. bonds
43,470.00
44,230.00
64,578.00
66,144.00
0.00
Cert. of deposit
20,678.88
20,989.01
21,228.18
21,682.56
0.00
Accounts and
16,116.81
15,422.34
12,912.35
11,177.71
18,634.07
notes rec.
Inventories
5,000.98
5,976.79
4,646.98
5,474.32
5,049.28
Prepaid expenses
525.17
1,458.12
1,632.80
1,651.52
1,413.13
Total Current
$130,560.18
$162,414.46
$168,963.99
$144,310.14
$92,118.41
Assets
Current
54,856.75
56,640.06
72,928.95
77,325.89
48,357.55
Liabilities
Working Capital
$ 75,703.43
$105,774.40
$ 96,035.04
$ 66,984.25
$43,760.86
Operating
$187,319.94
$142,435.66
$156,334.97
*
*
Expenses
Current Ratio
(Current Assets
to Current
2.38:1
2.87:1
2.31:1
1.87:1
1.91:1
Liabilities)
Quick Assets
$ 68,589.01
$ 95,412.27
$ 82,708.69
$ 51,745.17
$34,263.67
*52 Petitioner's earned surplus and undivided profits from its inception to date of trial were: Year Ended
Earned Surplus
March 31
and Undivided Profits
1948
$ 3,622.31
1949
18,411.19
1950
27,738.43
1951
44,862.38
1952
62,580.10
1953
74,784.49
1954
94,044.52
1955
120,044.46
1956
142,439.20
1957
162,914.20
1958
180,766.95
At no time throughout petitioner's history were funds ever loaned to any of its shareholders. In its early years petitioner had experienced considerable difficulty in borrowing money and had for this reason embarked on a program of financing its growth internally and did no borrowing throughout the years in issue. During all the years in issue petitioner has enjoyed a good credit rating. Eastman has been petitioner's principal supplier and sold to it on open account (2 per cent 10 days, net 30 days) because of its strong credit position. On February 18, 1957, respondent notified petitioner, pursuant to section 534, Internal Revenue Code of 1954, that he proposed to issue a statutory notice of deficiency for the fiscal years ending March 31, 1954, 1955, and 1956 with respect *53 to section 102, Internal Revenue Code of 1939, for the first year and section 531, Internal Revenue Code of 1954, for the second and third years. On March 14, 1957, petitioner sent respondent a sworn statement in apparent compliance with section 534(c), and described: "* * * statement of grounds (together with facts sufficient to show the basis thereof) on which [petitioner] relies to establish that all or any part of its earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business." Had petitioner distributed all of its net income after Federal income taxes for the fiscal years ending March 31, 1954, 1955, and 1956, it is stipulated that the individual income tax liability of Enright would have been affected as follows: Net Taxable Income
Tax
Calendar
As
Year
Reported
As Increased
Paid
Increased
Additional Tax
1954
$29,748.99
$ 48,816.39
$11,169.47
$19,601.68
$ 8,397.22 *
1955
31,788.31
57,528.25
12,277.71
24,907.50
12,629.79
1956
33,258.75
55,429.54
13,083.13
23,906.37
10,823.24
$94,796.05
$161,774.18
$36,530.31
$68,415.55
$31,850.25
*54 Petitioner was not availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed. Opinion Issue 1. Salaries Respondent contends that for each of the years in issue, reasonable compensation to Enright would have been $18,000 per year (rather than the $33,000, $35,000 and $34,000 actually paid) and that only this amount should be deductible under section 162(a)(1) [3] or its predecessor under the 1939 Code. What constitutes a reasonable salary presents, of course, a question of fact, Geiger & Peters Inc., 27 T.C. 911 (1957), to be decided in light of all the attendant circumstances. As respondent points out a salary paid by a closely held corporation *55 to its principal shareholder must be closely scrutinized lest the corporation be permitted to pay what are in substance nondeductible dividends in the guise of salaries. Wagegro Corporation, 38 B.T.A. 1225 (1938). However, we feel that the compensation arrangement here at issue survives such examination. It was within reasonable limits considering petitioner's gross and net income during those years. The evidence, emanating largely from impartial sources, is uncontradicted that Enright was the sine qua non of petitioner's success. He bore the brunt of all the executive and policy-making problems. His invention was a material factor in petitioner's continued high earnings and customer good will. The continuance of the profitable business relationship with Katz was due solely to Enright's personal contacts and reputation. The responsibility for keeping petitioner abreast of changes and advances in the industry and for early launching its entry into the color photography field as well as selling, purchasing, production, personnel and other duties described in our findings was upon him. While the estimates as to the reasonable value of Enright's services varied, no witness *56 placed it at under $30,000. Enright himself placed it at $35,000. He was competent to testify in this regard, his interest in the matter merely affecting the weight to be accorded his testimony. Builders Steel Co. v. Commissioner, 179 F. 2d 377 (C.A. 8, 1950). Perhaps, we could disregard the testimony of Enright as well as that of Sal, James and the well qualified controller of petitioner on the basis that it is patently self-serving. Wagegro Corporation, supra.However, we have observed Enright's demeanor at the trial and believe his testimony to be sincere and reliable. In any event, we also have uncontradicted testimony from impartial witnesses placing a reasonable value for Enright's services at about $35,000. One such witness who so testified was Lovett, the president of Elko, (called by respondent). He had long experience in the field, kept himself informed on his competition and was familiar with petitioner's operations and with Enright's services. This clearly qualified him to express his opinion. Builders Steel Co. v. Commissioner, supra. Respondent argues that Enright's salary should certainly be no higher than that of Lovett, *57 the competitor's president. But Lovett testified that since 1946 he had been receiving a base salary of $25,000 per year and a bonus amounting to 5 per cent of net income before taxes, and that another executive of Elko, who shared management duties with Lovett, received identical compensation. Elko also had a buyer who earned $10,000 per year and relieved Lovett of the purchasing functions. Obviously, Enright's responsibilities were greater and more varied than Lovett's. Another unrelated and well qualified witness testified that Enright's value to his firm was substantially greater than the value of other executives in the industry (including Lovett) to their firms. It is certainly proper that we emphasize the greater duties of Enright as compared to those of other executives (even though they have the same titles) in the field. Geiger & Peters, Inc., supra.
Respondent challenges the bonus portion of the compensation as in effect a distribution of earnings. However, it is well recognized that a bonus system based on net profits is an established, permissible and often very necessary incentive compensation device in modern American industry. William S. Gray & Co. v. United States, 35 F. 2d 968, 974. *58 It is also significant to note that petitioner's bonus system was erected prior to the years in question. This renders it less likely to be a dividend substitute. Streckfus Streamers, Inc., 19 T.C. 1 (1952). This circumstance makes the arrangement even stronger than the one which we sustained in Geiger & Peters, Inc., supra.[4]
*59 We recognize, as respondent's above cited regulations provide, that a contingent compensation arrangement may become suspect when it is not arrived at "pursuant to a free bargain." However, the mere fact that Enright was the principal and most forceful shareholder does not per se invalidate the arrangement. For that matter, in virtually all the litigated cases on this question the corporations were closely held, usually by a small family group. Here, we have credible evidence that while Enright was the dominant voice in corporate affairs, other parties participated in setting corporate policy. Furthermore, the bonus arrangement was much like that of other firms in the industry. We also feel that (contrary to respondent's contention) the record supports the conclusion that the compensation arrangement here in issue was partly designed to reward Enright for services performed in prior years and for which he had been underpaid. Compensation for services rendered in prior years but not paid (nor accrued) until the current year is deductible in the tax year when paid. Lucas v. Ox Fibre Brush Co., 281 U.S. 115 (1930). Nor does respondent contend otherwise. Accordingly, *60 we hold from the entire record that the compensation paid to Enright during the years in issue was reasonable in amount and fully deductible. Issue 2. Accumulated Earnings Respondent maintains that petitioner was availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings or profits to accumulate instead of being distributed, and is accordingly liable for the surtax penalty under sections 531 and 532. [5]
*61 Under section 533(a) [6] the fact that earnings are permitted to accumulate beyond the reasonable needs of the business creates a presumption that the corporation was availed of for the proscribed purpose. We must therefore determine whether petitioner has permitted such an unreasonable accumulation of earnings and we note that at the start of the period on March 31, 1953, petitioner had earned surplus and undivided profits of (round figures) $75,000. During the 3 years in issue, petitioner added $19,000, $26,000 and $22,000. Inasmuch as we feel that petitioner has affirmatively and clearly demonstrated the reasonableness of its accumulations, we need not decide the question as to which party bears the burden of proof on this issue under section 534. Cf. Breitfeller Sales, Inc., 28 T.C. 1164 (1957); F. E. Watkins Motor Co., 31 T.C. 288 (1958); R. Gsell & Co., 34 T.C. 41 (on appeal C.A. 2). Again, we are confronted with a question which is essentially one of fact, no one factor being controlling and other cases having comparative value only. World Pub. Co. v. United States, 169 F. 2d 186 *62 (C.A. 10, 1948), certiorari denied 335 U.S. 911 (1949), rehearing denied 336 U.S. 915 (1949). Although there has been an infinite variety of factual patterns presented to the courts a generalization may nevertheless be made: The provisions of section 531 and its predecessors are penal in nature and are designed neither to harass corporate directorates nor to prevent them from retaining profits to finance a sound, good faith program of expansion. As we recently observed in F. E. Watkins Motor Co., supra, at page 300: "A capitalistic economy requires some freedom of action on the part of those engaged in it and the needs of a growing business of necessity must be determined by those engaged in its direction." See also General Smelting Co., 4 T.C. 313 (1944); Breitfeller Sales, Inc., supra. Bearing this in mind, we consider petitioner's financial situation. There can be no doubt that petitioner was in a growth industry experiencing rapid technological change. To remain static in this field would be to invite customers to discontinue their custom. Thus, the pure need for survival compelled petitioner to enter the color *63 field. Intelligent management could not have done otherwise. From reliable estimates the cost of entry into the color fields appeared to be at least $150,000 and estimates ranged upwards to $200,000. Furthermore, it appeared likely that entry into this field would be risky and might require petitioner to absorb operating losses for several years. It is also clear that petitioner had to acquire additional quarters to house the color operation and did spend $45,000 of $50,000 earmarked for this purpose. Furthermore, this building had to be air conditioned in order for the color processing to be carried on effectively. Petitioner also felt it was necessary to have a spare printing machine, costing $25,000, available to insure prompt service to customers. This does not seem unreasonable in this business, so dependent on good customer relations. Other factors considered are that petitioner at no time loaned money to its stockholders. There was a strong possibility of protracted patent litigation primarily with Eastman which had been using apparatus quite similar to the coding device on which petitioner's patent application was pending during the years in issue. A qualified local patent *64 attorney testified that litigation was being considered from July 1953 until 1958 (when in February of the later year Eastman finally entered into a licensing agreement with Enright and the proposed suit was dropped) and that such litigation would cost at least $25,000. We mention these various needs of petitioner's business to show that even $200,000 would be a conservative estimate of petitioner's needs as they appeared during the period here in issue. The facts as they appeared at this crucial point of time are those against which petitioner's retention of funds must be judged. Breitfeller Sales, Inc., supra.These needs were real and immediate, final investment being postponed only because of delay by Eastman in making the needed equipment available. Similarly the danger of losing the Katz account, there being no contract with Katz, was a real threat which must be taken into account. It is significant to note that petitioner did soon form a subsidiary for the color film operations and that by March 31, 1957, petitioner's working capital ratio had declined to 1.87:1 and its net quick assets were only $51,745.17 (and by 1958 they were only $34,263.67). This sequence *65 of events, viewed against the undisputed urgency of entering the color film field serves to distinguish this case from those in which the plans for investment of working funds are vague or remote or are only general ideas for the far distant future. Cf. I. A. Dress Co., 32 T.C. 93 (1959), affd. 273 F. 2d 543 (C.A. 2, 1960), certiorari denied 362 U.S. 976 (1960); Wellman Operating Corporation, 33 T.C. 162 (1959); American Metal Products Corporation, 34 T.C. 89 (on appeal C.A. 8). Respondent argues that the fact that petitioner's earned surplus steadily increased from April 1, 1954, shows that the accumulations of earnings beyond this date were unnecessary. His understanding of corporate accounting is obviously confused. For, if an increase in earned surplus, of itself, showed that an accumulation was improper we would have to condemn every corporation which financed growth through current earnings and we could justify accumulations only where a corporation suffered operating losses during the tax year. What respondent overlooks is that the employment of working funds within a business to purchase fixed assets is not *66 an occasion for a charge against earned surplus. Rather, it decreases working capital. That this decrease appeared likely to and did occur here we regard as highly significant. Accordingly, we conclude from all of the facts here that petitioner did not permit earnings to accumulate beyond the reasonable needs of the business. We recognize that this holding does not automatically dispose of the case for petitioner still must carry the ultimate burden of demonstrating that it was not availed of for the purpose proscribed by section 532. Pelton Steel Casting Co., 28 T.C. 153 (1957), affd. 152 F. 2d 278 (C.A. 7, 1958), certiorari denied 356 U.S. 958 (1958); I. A. Dress Co., supra.Nevertheless, the fact that an accumulation of funds is reasonable in amount in terms of needs of the business as a practical matter strongly suggests the absence of the forbidden purpose. United States v. R. C. Tway Coal Sales Co., 75 F. 2d 336 (C.A. 6, 1935); Jones v. Koma, 218 F. 2d 530 (C.A. 10, 1955); and cases there cited. The problem has been simplified, as to the last 2 years here involved, by the advent of section 535(a) *67 and (c)(1). [7] Since we have found that all the earnings were retained for the reasonable needs of the business, the section 535(c)(1) credit for fiscal 1955 and 1956 would be the total taxable income for each of these years and, accordingly, the section 535(a) accumulated taxable income on which the section 531 tax is imposed would be zero as to each year. Our ultimate conclusion from the entire record is that petitioner was not availed of for the purpose of avoiding the income tax with respect to its shareholders during any of the years in issue. To give *68 effect to other adjustments agreed to by the parties, Decision will be entered under Rule 50. Footnotes
1. Except where otherwise noted, references are to the Internal Revenue Code of 1954. ↩
2. Sec. 102, I.R.C. of 1939↩.
*. The Crown Drug account was lost in July 1955.↩
*. Not available.↩
*. Discrepancy is not explained.↩
3. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; * * * (Section 23(a)(1)(A) of the 1939 Code is identical in substance.)↩
4. Regs. 1.162-7(a)(2) provide: (2) The form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid.↩
5. SEC. 531. IMPOSITION OF ACCUMULATED EARNINGS TAX. In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax * * *. SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX. (a) General Rule. - The accumulated earnings tax imposed by section 531 shall apply to every corporation * * * formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed. (Section 102(a)↩ of the 1939 Code is identical in substance.)
6. Substantially identical to section 102(c)↩ of the 1939 Code.
7. SEC. 535. ACCUMULATED TAXABLE INCOME. (a) Definition. - For purposes of this subtitle, the term "accumulated taxable income" means the taxable income * * * minus [a deduction not here relevant] and the accumulated earnings credit (as defined in subsection (c)). * * *
(c) Accumulated Earnings Credit. - (1) General Rule. - For purposes of subsection (a), in the case of a corporation other than a mere holding or investment company the accumulated earnings credit is (A) an amount equal to such part of the earnings and profits for the taxable year as are retained for the reasonable needs of the business * * *↩