JAMES M. PIERCE CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 84670. Filed August 15, 1962.

*Kent Emery, Esq.,* and *James F. Swift, Esq.,* for the petitioner. *Jack Morton, Esq.,* for the respondent.

MULRONEY, *Judge:* The respondent determined deficiencies in petitioner's income tax as follows:

| Taxable year ended June 30— | Amount |
|---|---|
| 1954 | $35,129.47 |
| 1955 | 44,242.53 |
| 1956 | 38,791.48 |
| 1957 | 37,895.74 |

For the taxable year 1957 the respondent originally determined a deficiency in the amount of $37,895.74, and in an amendment to his answer the respondent determined an additional deficiency of $307,546.21, making a total deficiency for that taxable year of $345,441.95. The issues remaining for our consideration are (1) whether petitioner was availed of during the taxable years before us for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed within the meaning of section 102 of the Internal Revenue Code of 1939 and sections 531–537 of the Internal Revenue Code of 1954[1]; and (2) whether respondent correctly included in petitioner's income for the taxable year 1957 its reserve for unearned subscriptions in the amount of $396,019.31 and its reserve for perpetual subscriptions in the amount of $40,340.25.

### FINDINGS OF FACT.

Some of the facts were stipulated and they are herein included by this reference.

James M. Pierce Corporation, hereinafter called the petitioner, was incorporated in the State of Iowa in 1902 as the Homestead Company for the purpose of taking over a publishing business founded by James M. Pierce. In October 1929 petitioner changed its name to the James M. Pierce Corporation. Petitioner filed its corporation income tax returns for the taxable years ended June 30, 1954 through 1959, with the district director of internal revenue for the district of Iowa, at Des Moines. Petitioner maintains its accounting records and files its income tax returns on an accrual method of accounting.

During the taxable years petitioner was engaged in publishing and distributing a farm newspaper known as Wallaces' Farmer and Iowa Homestead. Petitioner also conducted a job printing business. Petitioner has maintained its principal place of business at 1912 Grand Avenue in Des Moines, Iowa. The land at that location was purchased by petitioner in 1913 and the first buildings were erected on the site by petitioner in 1914 and 1915, with additional buildings erected in 1920 and 1951.

---

[1] All section references will be to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

On September 21, 1929, petitioner sold its real estate, machinery, and equipment, and all assets relating to its job printing business and to the publication of the Iowa Homestead to the Wallace Publishing Company, publisher of a farm newspaper known as Wallaces' Farmer. After the sale the two farm newspapers (the Iowa Homestead and Wallaces' Farmer) were combined into one farm newspaper, Wallaces' Farmer and Iowa Homestead. Wallace Publishing Company became delinquent in its purchase contract on October 15, 1931, foreclosure proceedings were instituted by petitioner, and on April 2, 1932, Dante M. Pierce was appointed receiver and he assumed direct management of Wallace Publishing Company during receivership. In December 1935 petitioner purchased at a sheriff's sale all of the property owned by Wallace Publishing Company and used in the operation of its business. Judgment had been entered against Wallace Publishing Company for $2,230,950.40; the property was bid in by petitioner for a total of $1,013,000; and the petitioner assumed the liabilities of Wallace Publishing Company, including liabilities for unearned subscriptions. Included in the assets of Wallace Publishing Company acquired by the petitioner in December 1935 was "Circulation Structure" in the amount of $158,282.14.

Dante M. Pierce succeeded his father, James M. Pierce, as president and general manager of the petitioner in 1920 and served in such capacity until his death on July 27, 1955. Richard S. Pierce, son of Dante M. Pierce, succeeded his father as president and as publisher of petitioner's newspaper.

During the taxable years 1954 through 1957 the petitioner's outstanding capital stock consisted of 2,000 shares of common stock having a par value of $100 per share. During the petitioner's taxable year 1954 and as of the date of death of Dante M. Pierce, July 27, 1955, the petitioner's common stock was owned as follows:

| Stockholder | Shares held 6/30/54 and 7/27/55 | Percentage |
|---|---|---|
| Dante M. Pierce | 1,020 | 51.00 |
| Anne Pierce Schnabel | 365 | 18.25 |
| Anne Pierce Schnabel Trust | 125 | 6.25 |
| Elsie S. Pierce | 52 | 2.60 |
| Ray S. Pierce Trust | 438 | 21.90 |
| Total | 2,000 | 100.00 |

On June 30, 1957, the petitioner's common stock was owned as follows:

| Stockholder | Shares | Percentage |
|---|---|---|
| Estate of Dante M. Pierce | 1,020 | 51.00 |
| Anne Pierce Schnabel | 365 | 18.25 |
| Anne Pierce Schnabel Trust | 62½ | 3.15 |
| James M. Pierce | 163½ | 8.15 |
| Elsie S. Pierce | 52 | 2.60 |
| Hugo Schnabel, Jr | 62½ | 3.15 |
| Ray S. Pierce Trust | 274½ | 13.70 |
| Total | 2,000 | 100.00 |

The relationships of the several stockholders to Dante M. Pierce were as follows: Anne Pierce Schnabel, sister; Ray S. Pierce, brother; Elsie S. Pierce, sister-in-law; James M. Pierce, nephew; Hugo Schnabel, Jr., nephew.

Since 1929 petitioner has owned stock in the Wisconsin Farmer Company, a Wisconsin corporation, which publishes an agriculture newspaper. During the taxable years and as of June 28, 1957, the Wisconsin Farmer Company had a total of 400 shares of no-par-value common stock outstanding, of which petitioner owned 300 shares, and a total of 1,250 shares of 7 percent, $100-par-value preferred stock, of which petitioner owned 1,175 shares.

The principal properties left by Dante M. Pierce, who died July 27, 1955, were his 1,020 shares of $100-par-value common stock of petitioner, representing 51 percent of the outstanding stock, and $74,341.40 of life insurance proceeds, all of which insurance proceeds were payable to his widow. At the time of his death Dante M. Pierce was indebted to petitioner in the amount of $180,400, in that he had been making withdrawals from petitioner for a period of years, and petitioner owed Dante M. Pierce $20,400, representing unpaid dividends for 1931, so that the net amount due petitioner by Dante M. Pierce at the date of his death for previous withdrawals was $160,000. These withdrawals were not evidenced by notes in favor of petitioner, drew no interest, had no maturity date, and (except for the amount of $20,400) did not appear on the balance sheets of the petitioner at the end of its fiscal years 1953, 1954, and 1955. It was Dante's practice in these years to borrow money from a bank just prior to the end of petitioner's fiscal year, repay petitioner the outstanding withdrawals (except for $20,400), and then after the end of the fiscal year make further withdrawals from the petitioner which were used by Dante to repay his obligations to the bank.

If repayments had not been made by Dante M. Pierce at or just prior to the end of each fiscal year (and after allowing credit for $20,400 representing unpaid dividends for 1931), the liability of Dante M. Pierce to petitioner on June 30 of each of the years 1951 through 1955 would have been $19,000, $15,000, $97,000, $120,000, and $160,000, respectively.

At a special meeting of the board of directors of petitioner held on September 2, 1955, Richard S. Pierce, executor-nominee of the estate of Dante M. Pierce, notified the board of directors and the stockholders that at the time of his death Dante M. Pierce owed a net indebtedness of $160,000 to the petitioner. Petitioner filed a claim against the estate for this amount. The obligation of the estate to petitioner in the amount of $160,000 remained outstanding through June 30, 1957.

The estate of Dante M. Pierce was unable to repay petitioner the $160,000 debt of the decedent, the Federal estate taxes, and the State inheritance taxes without liquidating some of the common stock of petitioner which decedent owned. When the time came for the estate to make a payment of the Federal estate taxes due, petitioner was authorized by its stockholders and board of directors to make a loan to the estate, and, accordingly, on October 23, 1956, the petitioner made a loan to the estate in the amount of $65,000 evidenced by a 1-year 3-percent note. The note was paid within its time limitation.

During the taxable years ended June 30, 1946 through 1953, the petitioner had total net earnings after taxes of $1,655,052.40 and it paid total dividends of $763,759.84. During the same period it increased its inventories by $235,449.62 and its accounts and notes receivable by $66,173.53. During the taxable years 1954 through 1957 these same items were as follows:

| | Years ended June 30— | | | |
| | 1954 | 1955 | 1956 | 1957 |
|---|---|---|---|---|
| Net earnings after taxes | $223,415.47 | $244,900.89 | $223.899.42 | $231,459.09 |
| Additions to fixed assets | 117,982.88 | 134,928.62 | 86,780.15 | 125,158.70 |
| Increase (or decrease) in inventories | (41,839.58) | 8,733.28 | 111,856.21 | (121,345.72) |
| Increase (or decrease) in receivables | 14,805.77 | (6,441.56) | 66,907.39 | 18,246.43 |
| Dividends paid | 100,000.00 | 100,000.00 | 100,000.00 | 100,000.00 |

From 1930 through June 28, 1957, the petitioner had total net earnings after taxes in the amount of $3,367,805.06 and paid total dividends in the amount of $2,082,431.64.

Petitioner's earned surplus for the taxable years 1948 through 1952 was $1,114,789.17, $1,278,776.73, $1,399,861.85, $1,491,903.40, and $1,544,572.95, respectively.

Petitioner's balance sheets for the taxable years 1953 through 1957 disclose the following:

| ASSETS | June 30— | | | | | |
| | 1953 | | 1954 | | 1955 | |
|---|---|---|---|---|---|---|
| Cash, in bank and on hand | | $472,499.94 | | $576,313.76 | | $703,908.64 |
| U.S. Treasury bonds, (amortized value) | | 326,561.22 | | 326,453.24 | | 326,345.26 |
| Notes and accounts receivable | $221,035.84 | | $235,841.61 | | $229,400.05 | |
| Less: Reserve for bad debts [1] | 4,000.00 | | 4,000.00 | | 4,000.00 | |
| | | 217,035.84 | | 231,841.61 | | 225,400.05 |
| Inventories | | 346,098.35 | | 307,405.36 | | 312,992.05 |
| Other investments | | 448,363.56 | | | | |
| Cash value of officers life insurance | | | | 251,730.37 | | 269,728.80 |
| Stock in affiliate, Wisconsin Farmer Co., and other securities | | | | 214,692.74 | | 213,692.74 |

[1] A surplus reserve, includible in earned surplus.

| ASSETS—Continued | June 30— 1953 | | June 30— 1954 | | June 30— 1955 | |
|---|---|---|---|---|---|---|
| Depreciable assets | $1,591,840.93 | | $1,664,161.11 | | $1,770,307.27 | |
| Less: Reserve for depreciation | 899,167.09 | | 941,536.21 | | 1,002,866.88 | |
| | | $692,673.84 | | $722,624.90 | | $767,440.39 |
| Real estate | | 26,158.57 | | 26,158.57 | | 26,158.57 |
| Goodwill and deferred charges | | 167,782.58 | | 185,349.97 | | 187,020.30 |
| Other assets, advance payment on new equipment | | ------------ | | ------------ | | ------------ |
| Organizational expense | | ------------ | | ------------ | | ------------ |
| Total assets | | 2,697,173.90 | | 2,842,570.52 | | 3,032,686.80 |

LIABILITIES AND CAPITAL

| | 1953 | 1954 | 1955 |
|---|---|---|---|
| Dante M. Pierce, dividend (1931) | 20,400.00 | 20,400.00 | 20,400.00 |
| Notes and mortgages payable | 23,000.00 | 13,000.00 | 3,000.00 |
| Accounts payable | 78,020.22 | 72,334.14 | 91,226.38 |
| Federal income tax payable | 166,078.66 | 192,696.60 | 218,360.72 |
| State income tax payable | 2,776.86 | 3,124.75 | 2,726.30 |
| Accrued expenses | 81,298.56 | 86,538.07 | 78,219.94 |
| Unearned subscriptions | 447,163.69 | 447,699.29 | 456,499.92 |
| Perpetual subscriptions | 40,623.75 | 40,592.25 | 40,560.75 |
| Capital stock | 200,000.00 | 200,000.00 | 200,000.00 |
| Earned surplus | 1,637,812.16 | 1,766,185.42 | 1,921,692.79 |
| Total liabilities and capital | 2,697,173.90 | 2,842,570.52 | 3,032,686.80 |

| ASSETS | June 30— 1956 | | June 30— 1957 | |
|---|---|---|---|---|
| Cash, in bank and on hand | | $540,731.40 | | $717,533.53 |
| U.S Treasury bonds (amortized value) | | 620,862.28 | | 620,754.30 |
| Notes and accounts receivable | $455,887.44 | | $476,421.66 | |
| Less: Reserve for bad debts [1] | 4,000.00 | | ------------ | |
| | | 451,887.44 | | 476,421.66 |
| Inventories | | 424,848.26 | | 303,502.54 |
| Other investments: | | | | |
| Cash value of officers life insurance | | 28,786.16 | | 36,013.43 |
| Stock in affiliate, Wisconsin Farmer Co., and other securities | | 213,692.74 | | 213,692.74 |
| Depreciable assets | 1,825,617.87 | | 1,921,372.83 | |
| Less: Reserve for depreciation | 1,080,372.96 | | 1,155,549.98 | |
| | | 745,244.91 | | 765,822.85 |
| Real estate | | 26,158.57 | | 27,400.05 |
| Goodwill and deferred charges | | 178,501.91 | | 176,330.02 |
| Other assets, advance payment on new equipment | | 13,420.00 | | ------------ |
| Organizational expense | | ------------ | | 879.65 |
| Total assets | | 3,244,133.67 | | 3,338,379.77 |

[1] A surplus reserve, includible in earned surplus.

| LIABILITIES AND CAPITAL | June 30— | |
| | 1956 | 1957 |
| --- | --- | --- |
| Dante M. Pierce, dividend (1931) | $20,400.00 | $20,400.00 |
| Notes and mortgages payable | | |
| Accounts payable | 145,910.38 | 99,147.47 |
| Federal income tax payable | 186,998.03 | 197,960.12 |
| State income tax payable | 3,516.11 | |
| Accrued expenses | 84,399.21 | 20,372.91 |
| Unearned subscriptions | 434,438.02 | 396,019.31 |
| Perpetual subscriptions | 40,504.50 | 40,340.25 |
| Capital stock | 200,000.00 | 200,000.00 |
| Earned surplus | 2,127,967.42 | 2,364,139.71 |
| Total liabilities and capital | 3,244,133.67 | 3,338,379.7 |

The item shown as "Other investments" on the June 30, 1953, balance sheet and as "Stock in affiliate, Wisconsin Farmer Co., & other securities" on the June 30, 1954, 1955, 1956, and June 28, 1957, balance sheets includes stock in Wisconsin Farmer Company valued at $210,519.34 on the books of the petitioner. The item shown as "Goodwill & deferred charges" on the balance sheets as of June 30, 1953, 1954, 1955, and 1956 includes $158,282.14 carried on the books of the petitioner as "Circulation Structure" and the same item on the June 28, 1957, balance sheet includes $154,863.14 carried on the petitioner's books as "Circulation Structure."

Petitioner reported total income in its returns for the taxable years 1954 through 1957 in the respective amounts of $3,640,636.05, $3,823,562.57, $4,010,708.45, and $3,936,551.04, and in the same taxable years claimed total deductions of $3,224,274.79, $3,359,940.66, $3,590,197.68, and $3,510,529.55.

Petitioner's ratio of quick assets (cash and U.S. Treasury bonds) to current liabilities for each of the taxable years 1954 through 1957 was 2.36 to 1, 2.50 to 1, 2.65 to 1, and 3.96 to 1. Petitioner's ratio of current assets to current liabilities for each of the taxable years 1954 through 1957 was 3.78 to 1, 3.82 to 1, 4.66 to 1, and 6.26 to 1.

Petitioner sold subscriptions for fixed terms beyond 1 year and payment was made in advance by the subscriber. In or about 1919 the petitioner adopted the practice of reporting an aliquot part of prepaid subscription income for fixed periods for each year of the prepaid subscription period and continued such practice until petitioner sold its business on or about June 28, 1957. That part of the prepaid subscription income received by the petitioner in a given year which was not reported as income in that year was credited to an account entitled "Reserve for Unearned Subscriptions" if the subscription was for a fixed period. The balance in the petitioner's reserve for unearned subscriptions account as of June 28, 1957, was $396,019.31. In the audit reports prepared for petitioner for the taxable years 1953 through 1957 it was noted that "This account represents the income applicable to operations of future years on subscriptions obtained during the current and prior years."

When petitioner acquired the assets of Wallace Publishing Company in 1935, among the liabilities assumed by petitioner was a "Reserve for Perpetual Subscriptions" in the amount of $43,321.50. Prior to 1920 a subscriber paid $10 for a perpetual subscription, and the Wallace Publishing Company treated $1 as earned income for the taxable year in which the subscription was sold and carried the balance of $9 in the reserve for perpetual subscriptions account. A subscriber, his heirs, or assigns, could redeem the perpetual subscription certificate at any time after 1 year from date and receive $9. After 1920 the subscriber paid $12.50 for a perpetual subscription, and the Wallace Publishing Company treated $1.25 as earned income in the fiscal year in which the subscription was sold and carried the balance in the reserve account. A subscriber, his heirs, or assigns, could redeem the perpetual subscription certificate at any time and receive $11.25 in cash. Petitioner has not sold any perpetual subscriptions since 1935 and the balance in petitioner's reserve for perpetual subscriptions account as of June 28, 1957, was $40,340.25.

For the taxable years 1954 through 1957 the average total paid circulation of Wallaces' Farmer and Iowa Homestead was as follows:

| Taxable year ended June 30— | Amount |
| --- | --- |
| 1954 | $309,293 |
| 1955 | 309,212 |
| 1956 | 308,651 |
| 1957 | 308,598 |

On June 26, 1957, the stockholders of petitioner adopted a plan of complete liquidation and dissolution in accordance with section 337 with distribution of its assets, less assets retained to meet claims, to its stockholders within 1 year of such date.

On June 27, 1957, the stockholders of petitioner approved an offer of the Prairie Farmer Publishing Company, an Illinois corporation, to purchase the business of the petitioner. After giving effect to the assumption by the purchaser of certain liabilities of the petitioner, including the liability for unexpired subscriptions, the adjusted cash consideration was in the sum of $1,406,789, which cash consideration was set forth in the sales agreement, as follows:

| | Adjusted cash consideration |
| --- | --- |
| Circulation structure, going business | $1.00 |
| Inventories | 303,502.54 |
| Real estate | 21,186.00 |
| Buildings | 315,619.00 |
| Office furniture and equipment | 50,768.00 |
| Machinery, equipment, and automobiles | 500,936.92 |
| The Wisconsin Farmer Company stock | 193,308.66 |
| Accounts and notes receivable | 897.26 |
| Prepaid expense | 20,569.62 |
| Total | 1,406,789.00 |

Section 9 of the sales agreement provided as follows:

9. *Obligations assumed by Prairie Farmer.* Prairie Farmer assumes the obligation of Pierce to publish "Wallaces' Farmer and Iowa Homestead" and to carry out in accordance with their terms all subscription contracts in force as of the date of closing for the unexpired period of the subscriptions. Prairie Farmer also assumes the obligation of completing all work in progress at the date of closing and fulfilling all uncompleted contracts for job printing and for advertising in "Wallaces' Farmer and Iowa Homestead". Prairie Farmer agrees to assume and perform the ordinary trade obligations of Pierce under $1,000 (except for items to be paid for as inventory) and also assumes and agrees to carry out the purchase contracts listed in schedule 3 for the purchase of binding machinery and equipment and the slitter for the press at a price not to exceed that stated in said schedule 3. Prairie Farmer likewise assumes the obligations of Pierce under the labor contracts, the Prudential group life insurance contract, the Bankers Life group life insurance contract, the agreement with Mid-West Farm Paper Unit, the contract with Mutual Benefit Insurance Company to sell policies to subscribers, service contract with I.B.M. and charitable pledges listed in said schedule 3. Any accrued dividends under such group life insurance contracts shall become payable to Prairie Farmer. Prairie Farmer assumes the obligation of Pierce to accept delivery from Hennepin Paper Company of any rewound paper not delivered to Pierce prior to the date of closing, provided, however, that such paper be billed to Prairie Farmer at a price not in excess of the original billing to Pierce, and also assumes the obligation to accept delivery of paper, ordered for June delivery as set forth in said schedule 3 or in accordance with subparagraph (f) of paragraph 5, but not delivered to Pierce prior to the date of closing. Prairie Farmer also assumes in addition to the foregoing the contracts shown on schedule 3 under the caption "Additional contracts to be assumed by Prairie Farmer." Prairie Farmer assumes no other obligations and assumes no debts or liabilities of Pierce of any nature except as otherwise herein above expressly set forth.

Section 2 of the sales agreement provided that the closing of the sale would take place on June 28, 1957.

Petitioner made liquidation distributions to its stockholders on July 24, 1957, in the amount of $100,000 and on November 8, 1957, in the amount of $1,800,000.

The following table sets forth the amounts of Federal income taxes shareholders of petitioner, Dante M. Pierce (Estate of Dante M. Pierce after July 27, 1955) and Anne Pierce Schnabel, reported per return and computations for the taxable years 1954, 1955, and 1956, provided accumulated taxable income per statutory notice of deficiency and the amendment to answer had been paid in dividends to them in the percentage of their stock ownership:

| Year | Income tax reported per return | Income tax payable provided accumulated taxable income distributed per percentage of ownership |
|---|---|---|
| Dante M. Pierce (Estate after 7/27/55)   51 percent | | |
| 1954 | [1] $41,823.94 | $82,698.65 |
| 1955 | [1] 25,461.01 | 76,960.94 |
| Year ended June 30, 1956 | 23,929.96 | 75,739.57 |

[1] Includes assessments due to audits.

| Year | Income tax reported—Con. | Income tax payable, etc.—Con. |
|---|---|---|
| Anne Pierce Schnabel   18.25 percent | | |
| 1954 | $11,882.78 | $23,654.81 |
| 1955 | 10,096.09 | 24,087.34 |
| 1956 | 7,859.85 | 19,696.58 |

On March 17, 1958, respondent mailed to petitioner a notification as provided by section 534(b) with respect to the proposed accumulated earnings tax for the taxable year ended June 30, 1954, under section 102 of the Internal Revenue Code of 1939, and for the taxable years ended June 30, 1955 through 1957, under section 531. Within an extended time period the petitioner submitted a statement setting forth the grounds on which it relied, pursuant to section 534(c), to establish that all or any part of the earnings and profits were not permitted to accumulate beyond the reasonable needs of its business.

Respondent in the statutory notice of deficiency determined that petitioner was availed of for the purpose of avoiding income tax upon its stockholders through the medium of permitting its earnings and profits for the taxable years 1954 through 1957 to be accumulated beyond the reasonable needs of its business instead of being divided or distributed. In an amendment to his answer the respondent determined that the balance of $40,340.25 in petitioner's reserve for perpetual subscriptions account as of June 28, 1957, and the balance of $396,019.31 in petitioner's reserve for unearned subscriptions account as of June 28, 1957, were includible in petitioner's gross income and subject to the accumulated earnings tax for the taxable year 1957.

Petitioner did not permit its earnings and profits for its taxable years 1954 through 1957 to accumulate beyond the reasonable needs of its business.

Petitioner was not formed or availed of in its taxable years 1954 through 1957 for the purpose of avoiding the income tax with respect to its shareholders by permitting its earnings and profits to accumulate instead of being divided or distributed.

### OPINION.

Section 102 of the Internal Revenue Code of 1939 and sections 531 and 532 of the Internal Revenue Code of 1954 impose an additional tax, called an accumulated earnings tax, upon a corporation formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed.

The first issue is whether petitioner was availed of during its taxable years 1954 through 1957 for the purpose of avoiding the income tax with respect to its shareholders within the meaning of the above sections. The question is one of fact. *Helvering* v. *Na-*

*tional Grocery Co.*, 304 U.S. 282. The fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business is determinative of the proscribed purpose unless the corporation by the preponderance of the evidence shall prove to the contrary. (Sec. 102(c), I.R.C. 1939; sec. 533, I.R.C. 1954.) Section 537 provides that "the term 'reasonable needs of the business' includes the reasonably anticipated needs of the business." See also *Lion Clothing Co.*, 8 T.C. 1181. Section 534 casts the burden on respondent on the issue of accumulation beyond reasonable needs if the corporation has submitted a statement of the grounds and facts on which he relies to show there was no accumulation beyond reasonable needs.

Petitioner listed some 19 grounds in its statement under section 534(c) to establish that its earnings and profits were not accumulated beyond the reasonable needs of its business, and in an amendment to its petition listed 6 additional grounds, namely: (1) Need for installation of air conditioning, (2) need for a parking lot, (3) need for installation of lithographing equipment, (4) need for a new elevator, (5) need to replace usable but obsolete equipment, and (6) need to buy out minority stockholders in the Wisconsin Farmer Company. Respondent argues that the petitioner in his statement failed to include facts which would support the listed grounds, see section 534(c), and that consequently the burden of proof as to unreasonable accumulations does not shift to respondent under section 534(a)(2).

We need not decide the burden of proof issue. We believe that petitioner has demonstrated that it did not accumulate its earnings and profits beyond the reasonable needs of its business and that it was not availed of for the purpose of preventing the imposition of income tax on its stockholders. In *F. E. Watkins Motor Co.*, 31 T.C. 288, this Court said that in deciding whether a taxpayer had accumulated a greater surplus than was necessary for the reasonable needs of the business, "the actual current needs of the business are to be considered and also the necessity for presently accumulating a surplus to meet foreseeable future needs." In passing judgment on the reasonableness of accumulations to meet the needs of a business and to insure its continued success, we would hesitate to substitute our opinion as to the reasonableness of the amounts involved for the opinion of the corporate officers and directors who have exercised their business judgment after a consideration of these matters. *Breitfeller Sales, Inc.*, 28 T.C. 1164.

Petitioner's earned surplus at the end of its taxable years 1954 through 1957 was $1,770,185.42, $1,925,692.79, $2,131,967.42, and $2,364,139.71, respectively. We feel that petitioner's manner of doing business would justify the accumulation of funds to meet operation expenses for at least 1 year. See *F. E. Watkins Motor Co., supra;*

*J. L. Goodman Furniture Co.*, 11 T.C. 530. Petitioner's income tax return for the taxable year 1954 shows total deductions of $3,224,274.79 from a total income of $3,640,636.05. These deductions include printing and mailing costs of $735,826.86, salaries and wages, $958,731, compensation of officers, $39,637.55, and commissions, $105,-169.81. With the exception of the cost of materials ($704,213.13) which is included in the total deductions and which may properly be regarded as an inventory item, the bulk of the remaining expenditures were incurred by the petitioner in the current operation of its business. The pattern of current expenditures in the taxable years 1955 through 1957 is much the same, both as to the substantial amount of the expenditures and to the relation of total expenditures to total income. We have included these amounts in our findings of fact and it is unnecessary to repeat them here. It is apparent that, in view of the heavy current operational expenses required by the petitioner each year in carrying on its operations, its accumulation of funds as evidenced by its surplus account was not unreasonable.

It also appears that the petitioner, with competitive conditions in mind, was actively considering the installation of new lithographing equipment during the period before us, and actually purchased a small experimental press for about $5,000 with the intention of subsequently going into lithographing work on a large scale. Petitioner was also keenly aware of the growing competition to its farm paper by radio and television and felt it necessary to be in a sound financial condition to meet this competitive threat. In addition, there is some evidence that petitioner's executive officers felt the need to buy out the minority stockholders in the Wisconsin Farmer Company and they were considering a need for air conditioning the plant, replacing the 25-year-old printing equipment used for the farm paper, and installing an elevator for a more efficient use of petitioner's building. Not much weight need be given to these last enumerated factors since the petitioner's intentions as to them were not manifested by any concrete and definite course of conduct. See *Smoot Sand & Gravel Corp.* v. *Commissioner*, 241 F. 2d 197, 202. However, this evidence should not be ignored. There was evidence that these needs were discussed in meetings of the board of directors and the directors stated their views that a strong financial position should be maintained to meet these potential liabilities.

We have considered the withdrawals from the petitioner over a period of years made by Dante M. Pierce, who owned 51 percent of petitioner's stock. Many of the cases in this area regard the withdrawals by stockholders of corporate funds as one indication that such funds are not required for the needs of the business. This is some evidence to support respondent's position but we think it is weakened by the method employed by Dante in keeping these with-

drawals concealed from the other officers and directors by means of temporary borrowings from a bank, which were used to repay the petitioner at the end of petitioner's fiscal year.[2] Evidently his credit standing was such that he could at any time pay off these loans. Cf. *F. E. Watkins Motor Co., supra.* Petitioner's officers testified they were unaware of Dante's withdrawals of corporate funds, and, after Dante's death the petitioner, upon being informed that Dante owed a net indebtedness of $160,000 to the petitioner, filed a claim for such amount against his estate.

We hold that, upon careful analysis of the entire record and giving proper regard to the nature of petitioner's operations, petitioner did not permit its earnings and profits in the taxable years 1954 through 1957 to accumulate beyond the reasonable needs of its business. We have discussed only the dominant elements in the record which persuade us to reach this holding. Other arguments were advanced by petitioner which might lend additional support for its position but we need not discuss them.

We hold also that petitioner was not availed of during the taxable years 1954 through 1957 for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed. We believe that the petitioner's motives for the accumulations were geared to its reasonable corporate needs and not to any desire to avoid the imposition of taxes on its shareholders. It would serve no useful purpose to repeat the evidentiary facts which we have found and which we have discussed above. But on this ultimate issue it is especially significant, we think, that petitioner has consistently paid substantial dividends to its stockholders from its taxable years 1936 through 1957, including its taxable year 1939, which showed a net loss of $32,544.48. From 1930 through June 28, 1957, petitioner had total net earnings after taxes in the amount of $3,367,805.06 and paid total dividends in the amount of $2,082,431.64. Beginning with its taxable year 1947 the petitioner consistently distributed total dividends of $100,000 in each year, while its net earnings in this period ranged from a low of $144,670.24 (taxable year 1948) to a high of $285,345.94 (taxable year 1947). We think that this policy of dividend distributions over the years, coupled with the other evidence in the record, is inconsistent with a motive to prevent the imposition of taxes upon stockholders.

The next issue is whether respondent was correct in including in petitioner's income for the taxable year 1957 the balances in its reserve for unearned subscriptions account in the amount of $396,019.31 and its reserve for perpetual subscriptions in the amount of $40,340.25. On June 26, 1957, the stockholders of petitioner adopted a plan of com-

---

[2] These special circumstances, together with other factual differences, serve to distinguish this case from *Nemours Corporation,* 38 T.C. 585.

plete liquidation and dissolution under section 337, and on June 27, 1957, petitioner accepted an offer of the Prairie Farmer Publishing Company to purchase its business. It is stipulated that "After giving effect to the assumption, by the purchaser, of certain liabilities of the petitioner, including the liability for unexpired subscriptions, the adjusted cash consideration was in the sum of $1,406,789.00." Respondent contends that as a result of the assumption by the purchaser of the unearned subscriptions liability totaling $436,359.56 the petitioner realized income in that amount.

We agree with respondent. Petitioner sold subscriptions for fixed periods extending beyond the year of sale and although it received these payments in advance, did not include them all in its income for that year but, since 1919, adopted the practice of reporting only an aliquot portion of the prepaid subscription income in each year, and carrying the unearned portion of the subscription income in a reserve account. Obviously the subscription income was brought into income only in the year in which it was earned. When the purchaser of its business assumed the petitioner's liability for unearned subscriptions on June 27, 1957, the petitioner, in effect, realized income to the extent of the amounts of prepaid subscriptions which had been held in reserve until earned. The need for holding these unearned subscriptions in a reserve account no longer existed. Petitioner was released from its liability to its subscribers, and it was, consequently, the appropriate time to restore the prepaid subscriptions to income. If this were not done it is quite apparent that these amounts would, under the facts of this case, escape being taxed altogether.

An analogy exists in the line of cases involving reserves for bad debts being returned to income, the general rule being "that any balance in a reserve for bad debts existing when the reserve becomes no longer necessary, as for example, when all the accounts have been collected, must be included in taxable income, upon the theory that the amount of the reserve, having been previously deducted, must be restored to income." *Ira Handelman*, 36 T.C. 560, 565; see also *West Seattle National Bank of Seattle*, 33 T.C. 341, affd. 288 F. 2d 47.

We think the provisions of section 455, which was enacted in 1958, are of significance here even though the section was made applicable only to taxable years beginning after December 31, 1957. For years prior to 1940 many publishers reported their prepaid subscription income only as it was earned, and in 1940 the practice was sanctioned in I.T. 3369, 1940-1 C.B. 46, in the case of publishers on an accrual basis who had over the years consistently followed this practice.[3]

[3] I. T. 3369 states, in part, as follows:

"It is held that where a publisher of periodicals has, over a period of years, followed consistently either of the two methods outlined above, [reporting as income in year of receipt or reporting an aliquot part of the subscription income for each year of the sub-

However, the Treasury Department concluded that without express statutory sanction it could not permit new publishers to spread subscription income over the period of the subscription or permit publishers to change over to this method of reporting subscription income.[4] Section 455 was enacted to enable the remaining publishers to adopt this practice if they so elected.

Section 455 (b) provides as follows:

(b) WHERE TAXPAYER'S LIABILITY CEASES.—In the case of any prepaid subscription income to which this section applies—

(1) If the liability described in subsection (d) (2) ends, then so much of such income as was not includible in gross income under subsection (a) for preceding taxable years shall be included in gross income for the taxable year in which the liability ends.

(2) If the taxpayer dies or ceases to exist, then so much of such income as was not includible in gross income under subsection (a) for preceding taxable years shall be included in gross income for the taxable year in which such death, or such cessation of existence, occurs.

Section 455 (d) (2) defines the word "liability" as used in the section to mean "a liability to furnish or deliver a newspaper, magazine, or other periodical."

We do not think that section 455 (b) of the 1958 legislation expounds any new principle of tax law but, on the contrary, is merely a reiteration of a fundamental principle of taxation applicable to the treatment of prepaid income items which are deferred over future years. It merely prevents these income items from escaping taxation completely.

---

scription period] he may continue to file his returns on such basis, he will not be required to change to the other basis, and his net income for the past years will not be redetermined on such other basis. * * *"

[4] In Senate Report No. 1983, 85th Cong., 2d Sess., 1958–3 C.B. 922, 963, the Finance Committee stated the following:

"In the case of the publishers representing the major portion of the subscription income, this income is reported for tax purposes in the year in which the publisher is required to issue the periodical to which the income relates. In 1940 the Treasury Department officially sanctioned (in I.T. 3369, C.B. 1940–1, 46) this method of reporting subscription income in the case of the publishers of periodicals on an accrual basis who had over a period of years consistently followed the practice of reporting periodical subscriptions as income for the year of the subscription period rather than as income for the year of receipt. The Treasury Department has indicated that it permitted publishers who had consistently reported on this basis to continue to do so because to do otherwise would have resulted in a distortion of income, or would have resulted in double reporting in the same year, in one case 1 year's subscription income based upon receipts and in the other case 1 year's subscription income based upon the liability to provide the periodical. However, the Treasury apparently concluded that without express statutory sanction, it could not permit new publishers to spread subscription income over the period of the subscription, nor could it permit existing publishers to change over to this method of reporting subscription income.

* * * * * *

"your committee believes that it is unfair and discriminatory to permit the majority of publishers to defer the reporting of subscription income until the year of the subscription yet deny this treatment to publishers accounting for a minority of the publishing business. This appears particularly unfortunate in that the more favorable treatment presently is denied new publishers, adding to their already difficult problem of competing with well-established companies. * * *"

There is no merit in petitioner's argument on brief that it paid "The Prairie Farmer Publishing Company to assume the liabilities under the subscription contracts in that it transferred property to Prairie having a total market value in excess of the sum of the liabilities assumed and the cash received."

*Decision will be entered under Rule 50.*